K18VUSHH

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

ARTHUR USHERSON,

                    Plaintiff,

             v.                          19 CV 6368 (JMF)

BANDSHELL ARTIST MANAGEMENT,

                    Defendant.           HEARING

------------------------------x

                                         New York, N.Y.
                                         January 8, 2020
                                         9:30 a.m.

Before:

                    HON. JESSE M. FURMAN,

                                         District Judge

                         APPEARANCES

LIEBOWITZ LAW FIRM
     Attorneys for Plaintiff
BY:  RICHARD LIEBOWITZ

LIEBOWITZ LAW FIRM
     Attorney for Richard Liebowitz
BY:  JAMES FREEMAN

McGUIRE WOODS
     Attorneys for Defendant
BY:  BRAD R. NEWBERG
     STEPHEN FORESTA

K18VUSHH

1              (Case called)

2              THE DEPUTY CLERK:  Counsel, please state your name for

3    the record.

4              MR. FREEMAN:  Yes.  James Freeman, on behalf of

5    Richard Liebowitz and the Liebowitz Law Firm.

6              MR. LIEBOWITZ:  Good morning, your Honor.

7              Richard Liebowitz, Liebowitz Law Firm.  Good morning.

8              THE COURT:  Good morning.

9              MR. NEWBERG:  Brad Newberg of McGuire Woods.

10             MR. FORESTA:  Good morning, your Honor.

11             Stephen Foresta, also from McGuire Woods, on behalf of

12   defendant.

13             THE COURT:  Good morning as well.

14             And I assume the mediator, whose name I'm not going to

15   use on the record, is here?

16             THE MEDIATOR:  ███████████████.

17             THE COURT:  Okay.  Well, you used your own name.

18             All right.  As I said in my order, my plan is to hear

19   from Mr. Liebowitz first, then from Mr. Newberg, and then from

20   the mediator.

21             A couple things to note at the outset:

22             One, as I've made clear, as far as I'm concerned, the

23   hearing is limited to the two issues that I've flagged, namely,

24   whether Mr. Liebowitz obtained advanced permission to send

25   associates from his firm instead of himself to the mediation;

1   and whether he obtained advanced permission to have his client

2   participate by telephone, and the veracity of his

3   representations with respect to those issues.

4           I don't intend to allow any inquiry with respect to

5   the substance of the mediation itself.  As far as I'm

6   concerned, that remains within the scope of the confidentiality

7   of mediations generally.

8           Number two.  As I've just indicated, I don't see any

9   reason that the mediator's name needs to be part of the public

10  record.  To the extent that he identified himself a moment ago,

11  I'll have that redacted from the transcript of today's

12  proceeding.  But I would ask you refrain from using his name

13  and just refer to him as "the mediator" so that it's not part

14  of the public record.

15          With that, as I said, my plan is to have Mr. Liebowitz

16  testify first, Mr. Newberg, and then the mediator.  I would

17  think that the mediator should not be in the courtroom for the

18  testimony of those first two witnesses.  I'm open to your views

19  on whether Mr. Newberg should be here for the testimony of

20  Mr. Liebowitz.  But I would think he should or can, as

21  essentially a party or representative of the party in these

22  proceedings, but certainly open to hearing your thoughts on

23  that and anything else that you want to raise.

24          So, first, does anyone disagree that the mediator

25  should not be present?  I'd be inclined to let him go sit in

K18VUSHH

1  the jury room until his presence is needed.

2          MR. FREEMAN:  Yes, your Honor.

3          For the Liebowitz Law Firm, James Freeman.

4          We would respectfully request that the mediator excuse

5  himself during the cross-examination of counsel.

6          THE COURT:  All right.  Hold on one second.

7          I'll have my deputy just let him sit in the jury room

8  so that he's comfortable until we need to call him.

9          (Pause)

10          THE COURT:  All right.  Go ahead.

11          MR. FREEMAN:  We also have a brief application that

12  we'd like to make to the Court regarding the scope of evidence

13  to be presented at the hearing.  It shouldn't take more than 30

14  seconds.

15          So in our letter of December 16th to the Court, we

16  noted that there was an existing custom and practice of the

17  mediator granting Mr. Liebowitz permission for his clients to

18  appear telephonically in five separate cases that took place

19  between June of 2019 to September 2019.

20          We believe this evidence establishes a custom and

21  practice that's relevant on two independent grounds, the first

22  being that it would establish or help, at least, explain or

23  inform why there's a discrepancy between the mediator's sworn

24  declaration and Mr. Liebowitz's sworn decoration.  If the

25  mediator did grant Mr. Liebowitz, on five separate occasions

K18VUSHH

1    recently, permission for his clients to appear telephonically,

2    then it could well be that the mediator simply forgot that he

3    did so in this case, because he had routinely granted such

4    permission.  Perhaps it didn't register in his consciousness.

5               THE COURT:  Is the application to permit inquiry

6    into --

7               MR. FREEMAN:  The application is to present evidence

8    of and to ask the mediator, as well, about these five

9    proceedings.

10              THE COURT:  That's totally fine with me.  I think

11   that's within the scope of the two issues that --

12              MR. FREEMAN:  Okay.  Great.

13              THE COURT:  -- the hearing pertains to.

14              MR. FREEMAN:  Thank you, your Honor.

15              THE COURT:  Obviously we're not going to get into the

16   substance of any --

17              MR. FREEMAN:  No, just whether or not permission was

18   granted.

19              THE COURT:  All right.

20              Mr. Newberg, anything from your end?

21              MR. NEWBERG:  No, your Honor.  Thank you.

22              THE COURT:  All right.

23              And with respect to Mr. Newberg's presence, any issues

24   there?

25              MR. FREEMAN:  No issue, your Honor.

K18VUSHH

1          THE COURT:  Okay.

2          MR. NEWBERG:  Well, obviously I'd like to be heard.

3   But my understanding from the order is that, in part, I appear

4   to cross-examine Mr. Liebowitz; so it would be a good call for

5   me to do that.

6          THE COURT:  That's a good point.

7          Well, in any event, since there is no objection, you

8   will remain regardless.

9          All right.  Mr. Liebowitz, if you could please

10  approach the stand, and my deputy will administer the oath to

11  you in a moment.

12  RICHARD LIEBOWITZ,

13       called as a witness on his own behalf,

14       having been duly sworn, testified as follows:

15         THE COURT:  All right.  You may be seated.

16         MR. FREEMAN:  Just for clarification, Mr. Liebowitz's

17  direct testimony is already in the record.  So we would like to

18  examine at this point the custom and practice evidence.

19         So we'd like to -- with the Court's permission, to

20  approach the witness with Exhibit A, which is the docket sheet

21  and complaint in the matter of *Emerson v. Telepicture*

22  *Productions.*

23         THE COURT:  I was intending to proceed directly to

24  cross, but I suppose, to the extent that we have expanded the

25  scope to include those others, that's fine.  I'll allow it.

K18VUSHH                    Liebowitz - direct

1              MR. FREEMAN:  Thank you, your Honor.

2              May I proceed, your Honor?

3              THE COURT:  You may.  But why don't you use the podium

4    over there.

5              MR. FREEMAN:  Okay.

6    DIRECT EXAMINATION

7    BY MR. FREEMAN:

8    Q.  Good morning, Mr. Liebowitz.

9    A.  Good morning.

10   Q.  Do you recognize the docket sheet in the matter of *Emerson*

11   *v. Telepicture Productions*?

12   A.  Yes.

13   Q.  And were you the lead counsel of record in that case?

14   A.  Yes.

15   Q.  And was the assigned mediator in this action also the

16   assigned mediator in the *Emerson* action?

17   A.  Yes.

18   Q.  And was there a mediation held on July 22nd, 2019?

19   A.  Yes.

20   Q.  And according to paragraph 5 of the complaint, Mr. Emerson,

21   the plaintiff in that action, was located in New Orleans,

22   Louisiana?

23   A.  Yes.

24   Q.  And did the mediator grant you permission for Mr. Emerson

25   to participate by telephone?

K18VUSHH                          Liebowitz – direct

1    A.   Yes.

2    Q.   And was this grant of permission in writing?

3    A.   No.

4    Q.   And was the mediation successful?

5    A.   Yes.

6           MR. FREEMAN:  Your Honor, I'd like permission to

7    approach the witness to introduce Exhibit B.

8           THE COURT:  All right.  I don't think your questions

9    require the exhibits, so why don't you just --

10          MR. FREEMAN:  Okay.  Fine.  That makes it easier.

11          THE COURT:  And also just watch the form of your

12   questions, please; they should be open-ended, not leading.

13          MR. FREEMAN:  Okay.  Fair enough.

14   BY MR. FREEMAN:

15   Q.   In the matter of *Mottram v. Onion, Inc.*, Mr. Liebowitz,

16   what was your role in that case?

17   A.   Lead counsel.

18   Q.   And who was the assigned mediator in that case?

19   A.   The same mediator in this case.

20   Q.   And was there a mediation held in that proceeding?

21   A.   Yes.

22   Q.   And do you recall when it was?

23   A.   I don't recall the exact date, but --

24   Q.   If I represent that it was July 24th, 2019, would that be

25   accurate?

1    A.  If that's the date, then that's the date, yes.

2    Q.  And was Mr. Mottram, the plaintiff in that action, located

3    outside the court -- 100 miles outside the courthouse?

4    A.  Yes, he was located more than 100 miles outside the

5    courthouse.

6    Q.  Did you attempt to obtain permission from the mediator for

7    Mr. Mottram, the plaintiff in that action, to appear

8    telephonically?

9    A.  Yes.  I spoke to the mediator orally, and he granted

10   permission for the plaintiff to appear telephonically.

11   Q.  And do you recall whether that mediation was successful?

12   A.  Yes, it was successful.

13   Q.  Okay.  I'd like to turn the Court's attention to the matter

14   of *McGovern v. Q Digital, Inc.*

15           Mr. Liebowitz, do you recall what capacity you served

16   in in that litigation?

17   A.  Yes, I was lead counsel.

18   Q.  And do you recall who the mediator was?

19   A.  Yes, the same mediator as this case.

20   Q.  Was the mediation held on September 25th, 2019?

21   A.  Yes.  If that was the date, yes.

22   Q.  And do you recall where Mr. McGovern was located?

23   A.  Yes.  He was located in Florida, more than 100 miles away

24   from the courthouse.

25   Q.  And do you recall whether you obtained permission from the

K18VUSHH                    Liebowitz - direct

1    mediator?

2    A.  Yes, it was done orally.

3    Q.  And was that mediation successful?

4    A.  Yes.

5    Q.  Thank you.

6           I'd like to turn the Court's attention to the matter

7    of *Pereira v. Source Digital*.

8           THE COURT:  Can I just make this a little more

9    efficient?  In *Pereira* and *Sadowski*, the last two cases

10   referenced in your letter, was it the same mediator as in this

11   case?

12          THE WITNESS:  Yes.

13          THE COURT:  Were you lead counsel in both of those

14   cases?

15          THE WITNESS:  Yes.

16          THE COURT:  And did you obtain permission from the

17   mediator for your client to participate by telephone?

18          THE WITNESS:  Yes.

19          THE COURT:  Was that in writing?

20          THE WITNESS:  No.

21          THE COURT:  In both cases it was oral?

22          THE WITNESS:  It was oral.

23          THE COURT:  Okay.  Any other questions?

24   BY MR. FREEMAN:

25   Q.  Also, just one last question.  In *Sadowski v. Seeking*

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K18VUSHH                     Liebowitz – cross

1   *Alpha*, did you obtain permission for your associate to appear

2   in your stead?

3   A.   Yes.

4   Q.   And was there any objection by the mediator to that?

5   A.   No objection.

6           MR. FREEMAN:  Thank you, your Honor.

7           No further questions.

8           THE COURT:  All right.  Cross-examination.

9           MR. NEWBERG:  Good morning, your Honor.

10  CROSS-EXAMINATION

11  BY MR. NEWBERG:

12  Q.   Good morning, Mr. Liebowitz.

13  A.   Good morning.

14  Q.   Mr. Liebowitz, I'm going to start with Mr. Freeman's direct

15  here.  *Sadowski*, that's the case *Sadowski v. Seeking Alpha,*

16  *Inc.* that you were talking about?

17  A.   Yes.

18  Q.   And, in fact, you mentioned in your letter to the Court

19  that you cite as a case of yours that this mediator had granted

20  you permission for your client to appear telephonically;

21  correct?

22  A.   Yes.

23  Q.   Is that the full truth?

24  A.   Yes.

25  Q.   Isn't it the case that in *Sadowski*, it was actually your

K18VUSHH                          Liebowitz - cross

1    opponent who wanted his client to be able to appear

2    telephonically for the mediation because it was located far

3    away in Israel?

4    A.  Yes.

5    Q.  And isn't it true that on May 1st, 2019, just two months

6    before you filed this case, they were forced to make a letter

7    motion to this Court because they asked for your consent to

8    have their client appear telephonically, and you refused,

9    stating in an email to them that the rules of the mediation

10   office require parties to appear in person?

11   A.  Yes, they -- however, in the mediation rules --

12           THE COURT:  Yes or no is fine.  Go ahead.

13           MR. NEWBERG:  If I can approach the witness to give

14   him a copy of the letter motion in *Sadowski*.

15           THE COURT:  You may.

16   Q.  Mr. Liebowitz, do you have this May 1st, 2019 letter motion

17   in the *Sadowski* case in front of you?

18   A.  Yes.

19   Q.  And do you recognize that as a letter motion that was filed

20   in that case?

21   A.  Yes.

22   Q.  And where they say, Plaintiff's counsel emailed us

23   yesterday saying he will not agree to a telephonic appearance,

24   contending that the rules of the mediation office requires

25   parties to appear in person, is that an email -- is that an

K18VUSHH                          Liebowitz - cross

1    accurate representation?  Did you send that email?

2    A.   Could you repeat that?

3    Q.   Is it an accurate representation that you emailed the

4    defendant in that case saying you would not agree to a

5    telephonic appearance, contending that the rules of the

6    mediation office requires parties to appear in person for a

7    mediation?

8    A.   Well, they needed to get the mediator's permission to

9    allow --

10             THE COURT:  Mr. Liebowitz, it's a yes-or-no question.

11   Is that an accurate representation of the email?

12             THE WITNESS:  Yes, it's accurate, because I wasn't the

13   mediator.  They needed to get the mediator's permission, and

14   the mediator granted it because the client --

15             THE COURT:  Mr. Liebowitz, it's a simple question.  Is

16   that an accurate --

17             THE WITNESS:  Yes, that's accurate.

18             THE COURT:  Wait till I've asked my question so that

19   we are not talking over each other.

20             Is that an accurate representation of an email that

21   you sent to defendant's counsel in that case?

22             THE WITNESS:  Yes.

23             THE COURT:  Okay.

24             And for the record, this is docket number 21 in the 18

25   CV 9193 docket.

K18VUSHH                      Liebowitz – cross

1    BY MR. NEWBERG:

2    Q.  And why did you refuse consent in that case, Mr. Liebowitz?

3              MR. FREEMAN:  Objection, your Honor.

4              That question was already asked and answered.

5              THE COURT:  I don't think it was asked and answered,

6    but sustained as irrelevant.  Go ahead.

7              MR. NEWBERG:  If I may approach the witness to give

8    him a copy of the email that he sent to defendant's counsel in

9    that case.

10             THE COURT:  You may.

11             This does not come from the docket, I take it.

12             MR. NEWBERG:  That's right.

13             THE COURT:  Why don't we mark this as Defense Exhibit

14   1, is that --

15             MR. NEWBERG:  Yes, please.

16             THE COURT:  All right.  Go ahead.

17   BY MR. NEWBERG:

18   Q.  Mr. Liebowitz, you've just been handed Defense Exhibit 1.

19   I will represent that this was sent to me by defendant's

20   counsel in *Sadowski*, who redacted the mediator's name.  That

21   redaction is not for me.

22             Do you recognize this email that you sent to

23   defendant's counsel in *Sadowski*?

24   A.  Yes.

25   Q.  And where you state, We will not agree to client to appear

K18VUSHH                          Liebowitz - cross

1   via telephone, the rules of the mediation office requires

2   parties to appear.  We can work around their schedules, but

3   they need to appear.  Is that what you wrote to --

4   A.  Yes.

5   Q.  -- defendant's counsel?

6           Is that a yes?

7   A.  Yes.

8   Q.  So just a couple of months prior to filing this case, you'd

9   made the claim in *Sadowski* that not only would permission be

10  needed, that you cannot give permission, and you could not

11  consent, and that clients were required to attend mediation.

12  A.  Yeah, they can't get permission from me, but they could get

13  permission from the mediator, which is what the rules say.

14  Q.  You didn't say that in your email though; is that correct?

15  A.  But opposing counsel just has to look at the mediator's

16  rules and could have contacted the mediator to get permission

17  to have his client appear telephonically.  And that's what they

18  did.  And the mediator -- the same mediator in this case --

19  granted his client to appear telephonically.  And since the

20  rules say that only the mediator could grant permission for his

21  or her client to appear telephonically, that was fine.  He did

22  not need to get my permission, just the mediator's.

23  Q.  You didn't tell him though, Go get the mediator's

24  permission, you just said the rules require your clients to

25  appear in person; correct?

K18VUSHH                    Liebowitz - cross

1    A.  Well, the rules say that you could have the mediator -- you

2    could ask the mediator permission for his or her client to

3    appear telephonically.

4            THE COURT:  Mr. Liebowitz, again, I'm going to ask you

5    to listen to the question.  The question is you didn't say

6    anything about those rules in this email.

7            THE WITNESS:  No, I didn't say that.  I didn't say

8    anything in there.

9            THE COURT:  Thank you.

10   Q.  Now, Mr. Liebowitz, your response to this motion claimed

11   you're quite familiar with the mediation rules of this Court;

12   correct?

13   A.  Yes, I'm familiar.

14   Q.  And you attached some of the rules as an exhibit to your

15   response, right?

16   A.  Yes.

17           MR. NEWBERG:  May I hand the witness --

18           THE COURT:  You have may.

19           Since it's a hearing, we don't necessarily need to be

20   quite as formal, but I assume you move to admit Defense Exhibit

21   1.

22           MR. NEWBERG:  Yes, your Honor.  I'm sorry, when can

23   you mentioned Defense Exhibit 1, I had assumed it was admitted.

24   But you're correct, I should have said, I move to admit Defense

25   Exhibit 1.

1           THE COURT:  All right.  It is admitted.

2           Anything that's already on the docket I'll deem part

3     of the record.  And, for that matter, anything that's docketed

4     in another case, I also can take judicial notice of.

5           So go ahead.

6           (Defendant's Exhibit 1 received in evidence)

7           MR. NEWBERG:  Thank you, your Honor.

8           I'm not sure that I have anything that's not already

9     part of the record.

10    BY MR. NEWBERG:

11    Q.  So, Mr. Liebowitz, I want you to turn to the same page you

12    cite in your response, page 7.  And do you see Section 9(c),

13    where it states that lead counsel must attend the mediation?

14    A.  9(c) says:  Each represented party must be accompanied at

15    mediation by the lawyer who will be primarily responsible for

16    handling the trial of the matter.

17    Q.  And in this case that was you; correct?

18    A.  No.  I -- I have an associate that handles trials for me.

19    Q.  Mr. Liebowitz, was anyone but you admitted in this case to

20    represent plaintiff?

21    A.  At what time?

22    Q.  At any time.

23    A.  Well, I -- I was counsel of record at the time of the

24    mediation.  But I have associate that handles trial matters for

25    me, that take over for trial matters.

K18VUSHH                    Liebowitz – cross

1    Q.  At the time that the mediation was scheduled, was anyone

2    admitted to this case on behalf of plaintiff other than you?

3    A.  At the time I was only the counsel of record.  However --

4            THE COURT:  Just yes or no.

5            Was anyone else admitted at the time of the mediation?

6            THE WITNESS:  No.  If you mean admitted --

7            THE COURT:  Mr. Liebowitz, has anyone other than you

8    entered a notice of appearance in this case on the docket?

9            THE WITNESS:  Oh, no.

10   Q.  And that goes right up to the date of settlement; correct?

11   You were the only person who had filed a notice of appearance

12   who had appeared for the plaintiff in this case?

13   A.  Yes, I was the only counsel of record.

14           THE COURT:  In fact, to this date you are the only

15   counsel who has entered a notice of appearance on the docket in

16   this case; correct?

17           THE WITNESS:  Yes.

18           THE COURT:  And at the conference held on November

19   14th, you entered a notice of appearance on behalf of

20   Mr. Usherson.  Mr. Freeman appeared and made clear that he was

21   appearing on your behalf only, and not on behalf of

22   Mr. Usherson; correct?

23           THE WITNESS:  Yes.

24   BY MR. NEWBERG:

25   Q.  Are you aware of any section in these rules that allow lead

K18VUSHH                    Liebowitz - cross

1   counsel to not attend mediation?

2   A.  Well, from 9(c), when it says, Each represented party must

3   be accompanied at mediation by the lawyer who will be primarily

4   responsible for handling the trial of this matter, Mr. Freeman

5   would have handled the trial of the matter.

6   Q.  So Mr. Freeman, who had not entered an appearance, and

7   never entered an appearance in this case on behalf of

8   plaintiff, was going to be trial counsel?

9   A.  Yes.

10          THE COURT:  All right.

11          And Mr. Freeman didn't appear at the initial

12  conference in this case, did he?

13          THE WITNESS:  No, I don't believe so.

14          THE COURT:  All right.

15          And you have presumably read my initial conference

16  orders at this point?

17          THE WITNESS:  I believe so.

18          THE COURT:  And are you aware that one of the

19  provisions in that order states that, absent leave of Court

20  obtained by letter motion filed before the conference, all

21  pretrial conferences must be attended by the attorney who will

22  serve as principal trial counsel?

23          THE WITNESS:  Yes, I understand that.

24          But oftentimes during cases with my opposing -- with

25  my colleague, we often sometimes switch on who's going to be

1    trial counsel and who's going to be, you know, lead.  That

2    often happens.

3              THE COURT:  Prior to the initial conference in this

4    case, did you file any letter motion requesting permission for

5    Mr. Freeman to --

6              THE WITNESS:  No.

7              THE COURT:  Or, sorry, excuse me, for you to appear,

8    even though your testimony today is that you were not intending

9    to be a principal trial counsel, did you file a letter motion

10   to that effect?

11             THE WITNESS:  No, I -- no, because it wasn't trial

12   yet.

13             THE COURT:  Go ahead.

14             THE WITNESS:  If and when there would be a trial --

15   BY MR. NEWBERG:

16   Q.  Let's use your term of "trial counsel."  Are you aware of

17   any section in these rules that allow trial counsel to not

18   attend the mediation?

19   A.  I didn't read the whole thing, but from -- I don't

20   believe -- I don't believe so.

21   Q.  And are you aware of any rules that allow trial counsel or

22   lead counsel to ask for permission to not attend the mediation?

23   A.  Could you say that question again?

24   Q.  Are you aware of anything in the rules that would allow --

25   that says trial counsel or lead counsel may ask for permission

K18VUSHH                        Liebowitz - cross

1    to not attend a mediation?

2    A.   I don't think it is in the rules, but from the custom and

3    practice of working with the mediator in this case, and

4    previously granting my colleague James Freeman to appear in my

5    behalf, there was no issue.

6    Q.   But in answering the question, you're unaware of any rule

7    that would allow it?

8            THE COURT:   Just yes or no.

9    A.   I don't believe so.

10   Q.   When precisely did you ask the mediator for permission for

11   you to not attend the October 31st mediation?

12   A.   October 30th.

13   Q.   October 30th.  That's the date you're giving today, October

14   30th?

15   A.   Yeah, October 30th.  It was -- yes.

16   Q.   Did you tell the mediator why you would not be able to

17   attend?

18   A.   This is what I told the mediator:  I told the mediator on

19   October 30th that the parties have reached a settlement in

20   principle.  The parties reached an agreement on the number; and

21   that the parties were then just negotiating nonmonetary terms.

22           I then told the mediator if my client, the plaintiff,

23   can appear telephonically, because he lives in Georgia, and

24   since we were just negotiating the nonmonetary terms of the

25   agreement, the mediator said yes, that the plaintiff could

K18VUSHH                          Liebowitz - cross

1    appear telephonically.

2           I then asked the mediator if my colleague James

3    Freeman could appear instead of me.  He said yes.  And he's

4    done this on -- in terms of having James Freeman appear on my

5    behalf, he's granted that on one other occasion, and he had

6    granted the plaintiffs or my clients in other matters five

7    other times.

8    Q.  When on October 30th did you ask this permission?

9    A.  It was in the early evening.

10          THE COURT:  Is that early evening Eastern time?

11          THE WITNESS:  It was about -- I think it was somewhere

12   around 8 or 7, 7:30.  It was -- it was, I believe, after the

13   time that we had an agreement on the number, the settlement

14   number in the case.  And then that's when you -- when you sent

15   me or the mediator over the settlement agreement.  And I needed

16   to review the terms of --

17          THE COURT:  Mr. Liebowitz, the question was just

18   whether it was Eastern time or California time.  What time was

19   this --

20          THE WITNESS:  Yeah, it was about, I would say, 7:30, 8

21   o'clock Eastern.

22          THE COURT:  Okay.  And where were you at that time?

23          THE WITNESS:  I was in California.

24          THE COURT:  Were you speaking on your cell phone or

25   landline?

1          THE WITNESS:  No, I was speaking on my cell phone.

2          THE COURT:  And did you speak to Mr. Freeman in

3     advance of that call about appearing at the mediation or after

4     call?

5          THE WITNESS:  Well, he knew that I was having the --

6     that this was scheduled for the next day; and that he was

7     prepared to participate in the mediation in good faith.  I was

8     even going to have my sister, who's newly admitted to the bar,

9     also come shadow James at the mediation.

10          And the next day, Mr. Freeman and Ms. Liebowitz came

11     prepared in person --

12          THE COURT:  All right.  That's enough.  Getting beyond

13     the question.

14          And how long was the conversation with the mediator?

15          THE WITNESS:  It was short.

16          THE COURT:  And did you call him or he called you?

17          THE WITNESS:  No, I believe I called him.

18          THE COURT:  Go ahead.

19     BY MR. NEWBERG:

20     Q.  Mr. Liebowitz, are you testifying that you informed the

21     mediator that the parties had had an agreement on the number,

22     and that's why you should be allowed not to go to the

23     mediation?

24     A.  Well, it was -- it was -- just like in previous mediations,

25     I asked the mediator -- you know, the same mediator in this

K18VUSHH                    Liebowitz - cross

1    case -- if the plaintiff could appear telephonically, because

2    he lives in Georgia, more than 100 miles away.  And the costs

3    of traveling all the way to New York would have eaten into a

4    large portion of the settlement number.  And out of judicial,

5    you know, economy and trying to protect my client, you know,

6    from the expense of traveling, the parties agreed on a number.

7          And I asked the mediator, since we had a settlement in

8    principle and we were just negotiating the nonmonetary terms,

9    that, you know, we could get this, you know, done either in the

10   morning or at the mediation; and that there will be no issues,

11   just like in the previous five cases.

12         In the previous five cases, there were no issues at

13   all.  The client appeared telephonically, either I appeared or

14   Mr. Freeman appeared in the other cases.  And we reached an

15   agreement in most of those, and the parties were happy and

16   moved on.

17         THE COURT:  Did you explain all of what you just

18   described to the mediator, that in order to reduce costs

19   because you had an agreement in principle, you wanted --

20         THE WITNESS:  Yeah, well -- yeah, exactly.  I mean,

21   that's -- you know, that's --

22         THE COURT:  Yes or no?

23         THE WITNESS:  Yes.

24         THE COURT:  Did you explain that was --

25         THE WITNESS:  Yes.

1          THE COURT:  -- your reason -- again, wait for me to

2    finish my question.

3          Did you explain that that was your reason for

4    requesting permission for the client to appear by telephone?

5          THE WITNESS:  Yes.

6          THE COURT:  And did you reference the other five cases

7    involving the same mediator in which that permission had been

8    granted?  In the conversation with the mediator, did you make

9    reference to it?

10         THE WITNESS:  Oh, no, I mean, I didn't mention it.

11   But he -- he knows me, he knows that I had --

12         THE COURT:  Just answer the question.

13         The answer is no.  Okay.

14         Mr. Newberg.

15   BY MR. NEWBERG:

16   Q.  Yes.  I'm going to ask you to answer just the question I'm

17   asking, Mr. Liebowitz.

18         You're aware that day that the mediator is the one who

19   was emailing the parties trying to facilitate a settlement the

20   day before the mediation; correct?

21   A.  Yeah, the mediator facilitated settlement by emailing the

22   counsel, yes.

23   Q.  And when do you believe it was that the parties supposedly

24   had an agreement in principle on a number?

25   A.  It was the night before.  That's when -- that's when you,

K18VUSHH                          Liebowitz - cross

1   Mr. Newberg, sent the settlement agreement over to, I believe,

2   me and the mediator by email with the settlement agreement.

3   Q.  Your answer is October 30th, the night before the mediation

4   on October 30th?

5   A.  Yes.

6   Q.  So as of that time, you were already in Los Angeles;

7   correct?

8   A.  Yeah, I was in California, yes.

9   Q.  So you knew before any supposed agreement on the number,

10  that you would be in Los Angeles and not able to attend the

11  mediation; correct?

12  A.  No, I mean, that's not necessarily true.  I mean, I would

13  have came back.  I mean -- and this is a standard -- very

14  standard for the mediator.  I had a relationship with this

15  mediator --

16           THE COURT:  Mr. Liebowitz, just answer the question.

17           You knew at the time that you were going to be in Los

18  Angeles.

19           THE WITNESS:  Yeah, well, I was going to be in Los

20  Angeles the day before.

21           THE COURT:  When did you make the plan to go to Los

22  Angeles?

23           THE WITNESS:  That I don't know.

24           THE COURT:  When did you go to Los Angeles?

25           THE WITNESS:  I don't know the exact date, but I could

K18VUSHH                        Liebowitz – cross

1    tell you that on October 30th I was in Los Angeles.

2              THE COURT:  All right.

3              Am I correct that you appeared at U.S.C. on October

4    26th?

5              THE WITNESS:  Yes.

6              THE COURT:  And that's in California?

7              THE WITNESS:  Yes, that's in California.

8              THE COURT:  Were you in California from October 26th

9    through October 30th?

10             THE WITNESS:  Yes, at least.

11             THE COURT:  And at any point during your

12   communications with the mediator, did you mention that you were

13   in California?

14             THE WITNESS:  I mentioned that on October 30th, that I

15   was in California; and that we had an agreement, settlement in

16   principle.

17             THE COURT:  Just answer the question.

18             THE WITNESS:  Okay.

19             THE COURT:  So your testimony is that on October 30th,

20   you advised the mediator that you were in California?

21             THE WITNESS:  Yes, I was in California.

22             THE COURT:  Okay.

23             And at any point did you tell Mr. Newberg prior to the

24   mediation that you were in California?

25             THE WITNESS:  No, but I was --

1           THE COURT:  Just answer the question.

2           THE WITNESS:  No.

3           THE COURT:  All right.

4           And when you scheduled the mediation in this case, did

5    you know that you were going to be out of town?

6           THE WITNESS:  I knew I was going to be out of town at

7    least until the -- my speaking engagement at U.S.C.

8           THE COURT:  Okay.  So you did not know -- your

9    testimony is that when you scheduled the mediation, you did not

10   know you would be out of town on the date of the mediation?

11          THE WITNESS:  Well, no.  Well, I would have came back

12   for the mediation if -- if the parties either didn't have a

13   settlement in principle or -- or the mediator did not allow

14   Mr. Freeman to appear in my behalf.  But, yeah.

15          THE COURT:  And did you have a return ticket to come

16   back from Los Angeles?

17          THE WITNESS:  No, I didn't have a return ticket.

18          THE COURT:  Your testimony is that if you didn't have

19   an agreement on October 30th and you didn't obtain the

20   mediator's permission at 7:30, that you would have immediately

21   gotten on a plane and come back to appear the next day?

22          THE WITNESS:  Yeah.  And also I had -- I had a

23   relationship with this mediator.  He routinely granted --

24          THE COURT:  That's not my question.

25          My question is, is it your testimony that if one or

K18VUSHH                          Liebowitz - cross

1    both of those things had not happened, you would have gotten on

2    a plane --

3              THE WITNESS:  I would have came back.

4              THE COURT:  Okay.

5              And that is true even though your testimony is that

6    Mr. Freeman was the lawyer who would be primarily responsible

7    for handling the trial in this matter?

8              THE WITNESS:  Yeah.  But that -- again, that I asked

9    the mediator permission for Mr. Freeman to appear on my behalf,

10   so I did not have to come back.

11             THE COURT:  And did you advise the mediator that

12   Mr. Freeman would be the lawyer who would be primarily

13   responsible for handling trial?

14             THE WITNESS:  I just told him that my colleague,

15   Mr. Freeman, was going to appear on my behalf.

16             THE COURT:  Just yes or no, did you tell him that he

17   was the lawyer who was primarily responsible for handling

18   trial?

19             THE WITNESS:  I don't -- I don't believe so, but --

20             THE COURT:  And did you ever tell Mr. Newberg that?

21             THE WITNESS:  I don't believe so.

22   BY MR. NEWBERG:

23   Q.  Mr. Liebowitz, when was your marketing event in Los

24   Angeles?

25             MR. FREEMAN:  Objection, your Honor, on grounds of

1  relevance.

2            THE COURT:  I think I'll allow it to see where it

3  goes.  Go ahead.

4  Q.  When was your marketing event in Los Angeles?

5  A.  It wasn't a marketing event; it was a -- simply it was a

6  networking event for photographers in California whereby

7  photographers can network and meet one another.  And I was

8  hosting.

9  Q.  And you hosted this networking event, as you've just said;

10 correct?

11 A.  Yes, I hosted it.

12 Q.  And you hosted it on the night of October 30th, did you

13 not?

14 A.  Yes, I did.

15 Q.  So when was this networking event that you hosted set up?

16 A.  I don't know the exact date, but I know it was prior,

17 obviously prior to October 30th.

18 Q.  Was it prior to October?

19 A.  Possibly.

20 Q.  You don't know whether you set up a networking event that

21 you hosted prior to October?

22 A.  Yeah, I don't know the exact date that I set it up.

23 Q.  And you just testified to the Court that if we didn't have

24 a settlement in principle the night of October 30th, that you

25 were prepared to get on a plane that night and fly to New York

1    for the mediation; is that correct?

2    A.   Yes, if that -- if I had to do that, then I had to do it.

3    But as I stated previously, I have a custom and practice with

4    this mediator --

5             THE COURT:  Mr. Liebowitz, just answer the question

6    please.  I don't want to remind you again.

7             The question was, Was that your testimony?

8             The answer is yes.

9             Next question.

10   Q.   How old is Mr. Usherson?

11   A.   I don't know.

12   Q.   Approximately?

13   A.   I honestly do not know.

14   Q.   Older than 70?

15   A.   I don't know.

16   Q.   You don't know if he's older than 70?

17   A.   I don't know.

18   Q.   You're aware the photograph he supposedly took in this case

19   was taken approximately 50 years ago; correct?

20   A.   Yes.

21   Q.   You say you asked for permission for Mr. Usherson to attend

22   telephonically around 7:30 or 8 p.m. the night before the

23   mediation; correct?

24   A.   Yes.

25   Q.   Do you know if Mr. Usherson, did he have a plane ticket to

K18VUSHH                    Liebowitz - cross

1    come to the mediation?

2    A.  I am not sure.  But if he didn't, he would have jumped on a

3    plane that next morning or that evening and would have came to

4    the mediation.  I mean, this is -- there's no issues; you could

5    always get plane tickets fairly quickly.

6    Q.  So you were expecting that if you didn't get a settlement

7    in principle and permission, that you would have your elderly

8    client try to get plane tickets late in the night before the

9    mediation to get to the mediation the next morning; is that

10   correct gentlemen?

11             MR. FREEMAN:  Objection, your Honor.

12             Calls for speculation as to the age of plaintiff -- of

13   the plaintiff.

14             THE COURT:  Overruled.

15   A.  I don't -- what's the big deal?  I mean, people fly all the

16   time.  It doesn't matter someone's age.

17   Q.  How much involvement did Mr. Freeman have in this case

18   before the October 31st mediation?

19   A.  Yeah, I spoke -- I spoke to him on numerous occasions.

20   Q.  You spoke to him numerous occasions about this case prior

21   to the October 31st --

22   A.  Yes, in my office.

23   Q.  And when was the -- when was the first time, do you

24   remember?

25   A.  I don't know the exact date.

K18VUSHH                        Liebowitz - cross

1    Q.  Was it before October -- it was before you got --

2    supposedly got permission for him to attend around 7:30 or 8

3    o'clock on the night of October 30th?

4    A.  Yes, I spoke to him about it.  And that evening, after I

5    got the permission from the mediator for Mr. Freeman to appear

6    on my behalf, we discussed it in detail, and he was prepared to

7    appear at the mediation and have a good-faith mediation with

8    you, Mr. Newberg, and your client, and would have simply hashed

9    out the nonmonetary terms and probably would have --

10   Q.  Mr. Liebowitz --

11   A.  -- for a very short period of time.

12   Q.  I want you to answer the question I'm asking here.

13          You just testified that you had spoke to Mr. Freeman

14   numerous times about this case before October 30th; correct?

15   A.  Yes, I did.

16   Q.  Okay.  And what did you speak to Mr. Freeman about this

17   case before October 30th?

18   A.  I talked to him about the facts of the case.  This is a

19   pretty simple case; there's not that much to talk about.

20   Q.  And what kind of work, if any, did he do on this case prior

21   to October 31st?

22   A.  He reviewed the case, the complaint.  You know, I can't

23   speculate to what Mr. Freeman reviewed; all I could say is that

24   I spoke to him about it.  And then after I got the mediator's

25   permission for Mr. Freeman to appear on my behalf, I spoke to

K18VUSHH                      Liebowitz - cross

1    Mr. Freeman about it, and he was fully abreast of what was

2    happening; that the parties have agreed to a number in

3    principle; and that we were just hashing out the nonmonetary

4    terms.

5    Q.  But in terms of your -- these various communications before

6    October 30th with Mr. Freeman about the case, do you recall

7    about how many there were?

8    A.  Oh, that I don't know.

9    Q.  But he reviewed the various papers in this case up until

10   that point?

11   A.  Yeah, that's --

12         THE COURT:  In the conversation with Mr. Freeman after

13   your phone call with the mediator, first of all, that

14   conversation was by telephone, I assume?

15         THE WITNESS:  Telephone with who?

16         THE COURT:  With Mr. Freeman.

17         THE WITNESS:  Yes.

18         THE COURT:  And were you using your cell phone?

19         THE WITNESS:  I believe so.

20         THE COURT:  And did you advise him that the mediator

21   had granted permission for him to appear in your place?

22         THE WITNESS:  Yes, like what happened in *Sadowski v.*

23   *Seeking Alpha*.

24         THE COURT:  That's not my question.

25         Did you advise him that the mediator had granted

K18VUSHH                          Liebowitz - cross

1    permission for him to appear in your place?

2                   THE WITNESS:  Yes.

3                   THE COURT:  And did you advise him that the mediator

4    had granted permission for Mr. Usherson to participate by

5    telephone?

6                   THE WITNESS:  Yes.

7                   MR. NEWBERG:  May I proceed, your Honor?

8                   THE COURT:  You may.

9    BY MR. NEWBERG:

10   Q.  So you've now testified, I believe, three times in the last

11   couple of minutes about Mr. Freeman's involvement, review of

12   papers, etc., before October 30th.

13                  I want to read you the declaration of James Freeman,

14   which was attached to your response papers in this case.

15                  Paragraph 4, Mr. Freeman says:  I was informed as to

16   the existence of this matter at about 8 p.m. on October 30,

17   2019.  Do you wish to change your testimony?

18   A.  No, I mean, listen, Mr. Freeman and I have conversations in

19   my office all the time.  I mean, it is just --

20   Q.  Mr. Liebowitz, you said he reviewed papers in this case; he

21   was aware of the instances of the case; you had multiple

22   conversations, he reviewed multiple things before October 30th.

23   Do you wish to change that testimony?

24   A.  Again, I can't speculate to what Mr. Freeman did.

25   Q.  By the way, if Mr. Freeman was intended to be trial counsel

K18VUSHH                    Liebowitz - cross

1   all along, why did you have to ask for permission?

2   A.  I got permission so that -- I wanted to double -- double --

3   you know, just cover myself and make sure that the mediator was

4   on notice that Mr. Freeman was going to appear on my behalf.  I

5   have to do due diligence as a lawyer of this Court.  And I

6   asked the mediator if Mr. Freeman could appear on my behalf,

7   and he said yes.

8           THE COURT:  But the question is it's your testimony

9   and your position that Mr. Freeman was the lawyer primarily

10  responsible for handling trial in this matter; correct?

11          THE WITNESS:  Yes, just like in other cases.

12          THE COURT:  So it's your testimony and position that

13  Mr. Freeman was, in fact, the person required by Rule 9(c) of

14  the mediation rules to appear in person at the mediation; is

15  that correct?

16          THE WITNESS:  Yes.

17          THE COURT:  So the question is given that, why did you

18  seek the mediator's permission for him to appear, if, under the

19  rules, in your view, he was required to be the lawyer to

20  appear?  Do you understand?

21          THE WITNESS:  I believe I understand the question.

22          Yeah, I just wanted to tell the mediator, out of

23  respect for him, that Mr. Freeman was going to appear on, you

24  know, my behalf.  And he said, Yes, that's fine.

25          THE COURT:  But you didn't tell him in that

K18VUSHH                         Liebowitz - cross

1   conversation that Mr. Freeman was actually the lawyer primarily

2   responsible for trial in this matter and therefore --

3              THE WITNESS:  No, I don't believe so.

4              THE COURT:  Okay.

5   BY MR. NEWBERG:

6   Q.  Did you ever ask me or any attorney for defendant for any

7   sort of consent for you not to be there?

8   A.  I didn't hear the question.

9   Q.  Did you ever ask me or any other attorney for defendant for

10  consent for you not to be there?

11  A.  No, I didn't.  And the reason for that is because the rules

12  do say that if I got the mediator's permission for the

13  plaintiff, for the client, to appear telephonically, it doesn't

14  say anything in the rules that say that you need to let

15  opposing counsel know.

16             However, I do understand that it is best practice to

17  notify opposing counsel to -- that, you know, who's going to

18  appear, whether the mediator -- whether the client will appear

19  in person.  I understand that.

20             And I know it didn't happen in this case, but I did

21  let the mediator know, and I did get permission from the

22  mediator.  And I'm sorry that I didn't let you know, but I did

23  let the mediator know, and he said yes.

24             THE COURT:  And your testimony is that you advised

25  Mr. Freeman that the mediator had granted you permission to

K18VUSHH                        Liebowitz – cross

1    send him and for Mr. Usherson to appear by telephone?

2              THE WITNESS:  Did you say if I let Mr. Freeman know?

3              THE COURT:  Yes.

4              THE WITNESS:  Yes, I let Mr. Freeman know.

5              THE COURT:  Both of those facts, that the mediator had

6    granted you permission --

7              THE WITNESS:  Yes.

8              THE COURT:  -- for him to appear --

9              THE WITNESS:  Yes.

10             THE COURT:  -- and for Mr. Usherson to appear by

11   telephone?

12             THE WITNESS:  Telephone, yes.

13             THE COURT:  Okay.

14        And do you know that Mr. Freeman represented to me in

15   the November 14th conference that he had no knowledge one way

16   or the other as to what clearances were made in terms of

17   telephonic appearances?  Do you know that?

18             THE WITNESS:  Okay.  Well, listen, I mean, people

19   forget things.

20             THE COURT:  So your testimony is that his

21   representation was erroneous, was wrong.

22             THE WITNESS:  Yeah.  I mean, listen, at the end of the

23   day, people forget things, you know?  And, you know, all I know

24   is that I told the mediator that --

25             THE COURT:  My question is, is it your testimony that

K18VUSHH                       Liebowitz - cross

1    Mr. Freeman is forgetting or that you're perhaps for getting?

2               THE WITNESS:  Listen, I had a conversation with

3    Mr. Freeman the night before, and discussed about the case.

4    What was discussed on the phone call, I'm not -- my testimony

5    is that we did discuss that.  You know, whether or not, you

6    know, one of us is forgetting or lacking memory of what

7    happened, all I know is that on the night before, on the 30th,

8    I did speak with the mediator.  He granted my client to appear

9    telephonically.

10              THE COURT:  All right.  I got that.

11              THE WITNESS:  And I did ask the mediator whether -- if

12   Mr. Freeman could appear in my behalf, and he said yes.

13              THE COURT:  Did you take any notes of that call?

14              THE WITNESS:  I didn't take any notes.

15              THE COURT:  Did you make a record of the call after

16   the call?

17              THE WITNESS:  No.

18              THE COURT:  Did you send any emails regarding the

19   call?

20              THE WITNESS:  I don't believe so.

21              THE COURT:  All right.

22              Did you text anyone or send any --

23              THE WITNESS:  No, I don't believe so.

24              THE COURT:  You didn't make any written communication

25   with Mr. Freeman or otherwise about the mediator's conversation

K18VUSHH                          Liebowitz - cross

1   with him.

2            THE WITNESS:  No, no record.  I just had a phone call

3   with the mediator and spoke with Mr. Freeman.  And that's --

4   that's what happened.

5            THE COURT:  Did you tell your sister that you'd have

6   the call with the mediator?

7            THE WITNESS:  No, I don't believe I spoke with my

8   sister.  But my sister is newly admitted; she was going to come

9   shadow Mr. Freeman.

10           THE COURT:  All right.  I got that.

11           And did you communicate with Mr. Usherson on October

12   30th?

13           THE WITNESS:  I believe so.

14           THE COURT:  At what time?

15           THE WITNESS:  I don't know the exact time.

16           THE COURT:  Did you speak with him after your

17   conversation with the mediator?

18           THE WITNESS:  Yeah, I believe that I -- I believe that

19   we spoke regarding, you know, the settlement number and, you

20   know, about hashing out the nonmonetary terms.  I believe that

21   happened.  I'm not sure of the exact date.

22           THE COURT:  Okay.

23           Did you advise Mr. Usherson that he had been granted

24   permission to appear by telephone?

25           THE WITNESS:  Well, if he -- if he -- if he didn't

K18VUSHH                    Liebowitz - cross

1    have to appear in person, then -- then I would have just called

2    him that day and know that he's always around and --

3              THE COURT:  Did you tell him that he needed to be

4    available?

5              THE WITNESS:  Well, I told him that -- yeah, I told

6    him that he had to be prepared for the mediation if the

7    settlement didn't go through, and --

8              THE COURT:  And how did you leave things with the

9    mediator in your October 30th call?  Did you indicate that you

10   would call him back, that you would -- in other words, your

11   testimony is that you had reached a settlement in principle at

12   least on the monetary terms.  How did you leave things with

13   respect to --

14             THE WITNESS:  Yeah.  So simply what happened was I

15   told the mediator that I would get back to him on the

16   nonmonetary terms.

17             THE COURT:  That night?

18             THE WITNESS:  That night or that morning.  And I did

19   send back a redline with some revisions to the agreement.

20             THE COURT:  You sent back to the mediator?

21             THE WITNESS:  I believe the mediator or to

22   Mr. Newberg.

23             THE COURT:  Was there a plan to have a further

24   conversation with the mediator?

25             THE WITNESS:  Well, it was assumed that the next day

K18VUSHH                         Liebowitz - cross

1    at the mediation, that the parties will just hash out the

2    nonmonetary terms, if it wasn't agreeable.  There were very few

3    revisions.  And, you know, that's that.

4              THE COURT:  Okay.  Mr. Newberg.

5              MR. NEWBERG:  Just to follow up on a couple of your

6    questions, your Honor, and then I'll move on.

7    BY MR. NEWBERG:

8    Q.  Just to clarify in one single question, there is nothing in

9    writing confirming you received these permissions from the

10   mediator; that is correct?

11   A.  No, nothing in writing.

12   Q.  I'm sorry?

13   A.  Nothing in writing.

14             MR. NEWBERG:  And your Honor asked about Mr. Freeman's

15   recollection at the last conference.

16   Q.  Did you review Mr. Freeman's declaration before it was

17   filed in this case?

18   A.  No, I didn't review the declaration.

19   Q.  You didn't review the declaration --

20   A.  No, that's his testimony.  I mean, his recollection and my

21   recollection, often people forget things in this world.  And,

22   you know, lack of memory, you know, sometimes happens.  It

23   happens to all of us.  And --

24             THE COURT:  All right.  You signed the opposition

25   memorandum of law in opposition to defendant's sanctions;

K18VUSHH                         Liebowitz - cross

1    correct?

2              THE WITNESS:  I believe so.

3              THE COURT:  And that cites and quotes from

4    Mr. Freeman's declaration; correct?

5              THE WITNESS:  I believe so.

6              THE COURT:  Did you prepare that opposition?

7              THE WITNESS:  I must have.  I mean, I don't know what

8    I saw, you know --

9              THE COURT:  But your testimony is that you did not

10   review Mr. Freeman's declaration before it was filed, and yet

11   you cite it in the memorandum that you filed that same day.

12             THE WITNESS:  Yeah.  I mean, I could have signed it,

13   but I -- I, you know, left the declaration -- you know, his

14   declaration alone.

15             THE COURT:  Who prepared the opposition papers?

16             THE WITNESS:  It was Mr. Freeman and I.

17             THE COURT:  And did you review them before they were

18   signed?

19             THE WITNESS:  I reviewed the opposition, his

20   declaration.  I just assumed, you know, was his -- his

21   testimony and --

22             THE COURT:  Where it cites his declaration, did you

23   look at the declaration to confirm that the citations were

24   accurate?

25             THE WITNESS:  I'm not sure.  Again, Mr. Freeman often

K18VUSHH                        Liebowitz - cross

1    prepares things for me, and that's that.  I do often review

2    things, and do, you know, review what my colleague does.  And

3    declarations -- if that's what his declaration was, then that's

4    it.

5              THE COURT:  Okay.

6    BY MR. NEWBERG:

7    Q.  So getting back to just one more question on Mr. Freeman's

8    declaration, you've seen it since; correct?

9    A.  Say again?

10   Q.  Have you seen his sworn declaration?

11   A.  His declaration, I believe so.

12   Q.  Are you aware of anything in that which he signed,

13   presumably after time to think about it, where he mentions

14   anything about being aware that you got these permissions?

15   A.  All I know is that I got the --

16   Q.  It's a yes-or-no question.

17   A.  What was the question?

18   Q.  The question is are you aware of anything in Mr. Freeman's

19   declaration where he says or suggests that he was aware that

20   you got these permissions?

21   A.  I'm not aware.  I don't have the declaration in front of

22   me.  I don't know.

23   Q.  You didn't submit a declaration of Mr. Usherson in these

24   response papers; correct?

25   A.  I don't believe so.

1    Q.   Why not?

2    A.   The matter was between counsel and -- between counsel and

3    the Court.   I mean, I just don't think that getting a client

4    involved is necessary.

5    Q.   The Court asked you and I've asked you various questions

6    today about your communications with Mr. Usherson and when you

7    made him aware.   So you didn't think to have had the

8    declaration for Mr. Usherson backing up your story?

9    A.   I just don't think it's necessary.   I mean, I said what I

10   said and that's it.

11   Q.   So you stated a few times today, a number of times, that

12   this conversation with the mediator where you got these

13   permissions was October 30th; correct?

14   A.   Yes, 30th.

15   Q.   And I'll just ask a question.   Why did you wait till

16   October 30th to get these permissions?

17   A.   Again, it's custom and practice.   The parties reached a

18   settlement in principle on the number.

19   Q.   So is it your testimony that you only asked for these

20   permissions because you thought the parties had reached a

21   settlement in principle on the number?

22   A.   No, not at all.   The client lives 100 miles away in

23   Georgia.   And according to the mediation rules, you could ask

24   the mediator for permission for the client to appear

25   telephonically, and that's what I did.

K18VUSHH                          Liebowitz - cross

1   Q.  Why wait until the night of the -- the eve of the mediation

2   to do this?

3   A.  I understand that it's not best practice to do that, but I

4   had a custom and practice with this mediator that in five times

5   prior, he's granted my client's permission to appear

6   telephonically.  And just like in those cases, I assumed that

7   there would be no issue this time.  And there was no issue,

8   because he granted permission for my client to appear

9   telephonically and for Mr. Freeman to appear on my behalf.

10  Q.  So you were so confident in this practice, that you waited

11  until 7:30 or 8 o'clock the night before the mediation, while

12  you were in Los Angeles and your client was in Georgia with no

13  plans, flights, whatsoever, to get back to New York for the

14  next morning?

15  A.  Yeah.  I mean, what's the issue with that?  I mean, I think

16  that, you know, justice system, you want to try to save costs

17  and minimize costs.  And I'm trying to have the best interest

18  of my client to save cost and --

19  Q.  And you couldn't have done that by asking for permission

20  weeks earlier?

21  A.  Yeah, that could have been done, and I understand that was

22  not best practice.  But I had a custom and practice with this

23  mediator, as I said, all along, that he's granted my clients in

24  the past permission to appear telephonically, and in one other

25  occasion to have Mr. Freeman appear on my behalf.

K18VUSHH                        Liebowitz - cross

1    Q.  So October 30th, you've testified quite a number of times.

2                Do you remember you told this Court in open court just

3    a few days after the mediation, that you couldn't remember when

4    you asked permission?

5    A.  Yeah, I couldn't, because at the time I didn't remember.

6    Q.  So you're saying now that you couldn't remember that it was

7    the night before the mediation, but you do now, two months

8    later?

9    A.  Yeah.

10   Q.  You didn't put this October 30th date anywhere in your

11   response papers; correct?

12   A.  What do you mean by "response papers"?

13   Q.  In your declaration.  You don't say in your declaration, do

14   you, that you got permission on October 30th?

15   A.  I don't know.  I have to read my response papers.

16   Q.  I'm sorry, did you just say you didn't read --

17   A.  No, I need to review the response papers.  I don't remember

18   sitting here today.

19   Q.  Do you believe you put this October 30th date into your

20   declaration?

21   A.  I honestly don't know.  If I did, I did.  If I didn't, then

22   I didn't.

23   Q.  What about the brief, did you put in the brief at all that

24   you got this permission on October 30th?

25   A.  I don't know, sitting here today.

1              THE COURT:  All right.  Mr. Liebowitz, I'm going to

2      hand you docket number 22 from this case, which is your

3      declaration in this case.  I'll give you a moment to review it,

4      and then I'll follow up after.

5              (Pause)

6              THE COURT:  Anywhere in that declaration do you state

7      that the conversation in which the mediator granted you

8      permission?

9              THE WITNESS:  On line 13.  I say, Prior to October

10     31st, 2019.

11             THE COURT:  Anywhere in that declaration do you state

12     that that conversation took place the night before the --

13             THE WITNESS:  No.

14             THE COURT:  Thank you.

15     BY MR. NEWBERG:

16     Q.  Do you state in that declaration anywhere that the

17     permission occurred on October 30th, night, day?

18     A.  No.  All it said was "prior," which is all that's

19     necessary.

20     Q.  You didn't feel it was necessary to give this Court --

21     which asked you for a specific date -- a specific date?

22     A.  I don't recall if the Court asked for a specific date

23     and -- my declaration is accurate.

24     Q.  So you're saying when you signed this declaration, you knew

25     the specific date, October 30th, but you chose not to put it in

K18VUSHH                          Liebowitz - cross

1   your declaration and just write "prior to the mediation"?

2   A.  Yeah, that's accurate.  October 30th is prior to October

3   31st.

4            THE COURT:  And you appeared in front of me on

5   November 14th; correct?

6            THE WITNESS:  November 14th, I believe so.

7            THE COURT:  All right.

8            And that was two weeks after the mediation.

9            THE WITNESS:  Two weeks after.

10            THE COURT:  And two weeks and a day after the

11   conversation with the mediator that you're describing now.

12            THE WITNESS:  Yes.

13            THE COURT:  And at the time did you say to me in

14   response to my question when did you advise the mediator that

15   Mr. Usherson was not going to appear in person, did you answer,

16   "I don't know the exact date"?

17            THE WITNESS:  Yeah, I didn't know the exact date at

18   the time.

19            THE COURT:  So what refreshed your recollection

20   between November 14th and today?

21            THE WITNESS:  Because I -- I went back in my emails

22   and I saw the emails between the mediator, and I saw that it

23   was October 30th.

24            THE COURT:  And which emails exactly?

25            THE WITNESS:  They were just emails with the -- with

K18VUSHH                          Liebowitz - cross

1    the mediator.  I think one of them said, Talked to Richard and

2    he will get back to us in the morning, something along those

3    lines.  And on that -- that was October 30th.

4               THE COURT:  I assume you read the defendant's motion

5    for sanctions that was filed on November 6th; is that correct?

6               THE WITNESS:  I don't know the exact date when it was

7    filed.

8               THE COURT:  Did you read the motion before you

9    appeared for the conference on November 14th?

10              THE WITNESS:  I believe so.

11              THE COURT:  Okay.  We discussed the substance of the

12   motion at that conference; correct?

13              THE WITNESS:  I believe so.  I often forget things, so

14   I -- it's possible.

15              THE COURT:  Okay.  Did you look at Mr. Newberg's

16   declaration that he filed in support of the motion?

17              THE WITNESS:  I must have.  But --

18              THE COURT:  Did you look at the attachments to the

19   declaration?

20              THE WITNESS:  I must have.

21              THE COURT:  And the emails that you just referenced,

22   they are attached to the declaration, aren't they?

23              THE WITNESS:  They must be.

24              THE COURT:  So at the time of the conference on

25   November 14th, even though you reviewed those emails, you

K18VUSHH                        Liebowitz - cross

1    didn't remember the exact date of your conversation.  But

2    today, having reviewed those same emails, you do.  That's your

3    testimony?

4            THE WITNESS:  Yeah.  Now I know, because I looked at

5    the emails and it refreshed my memory.

6    BY MR. NEWBERG:

7    Q.  Mr. Liebowitz, I'm going to be blunt.  This isn't like it's

8    a random date months before, I can't remember September 7th or

9    September 8th.  We're talking about the night before the

10   mediation.

11           MR. FREEMAN:  Objection, your Honor.  He's just making

12   a statement, not asking a question.

13           THE COURT:  Overruled.

14   A.  Yeah.  I mean, I want to make sure that my statements are

15   accurate to the Court.  And if I don't know the exact date, and

16   I don't know the exact date.  But all I know was prior to

17   October 31st, and I did speak with the mediator on October

18   30th, which is prior to October 31st.

19   Q.  And so your testimony today is that, I remember now.  It

20   was the night right before the mediation, but I just couldn't

21   remember it for the last couple of months?

22   A.  Yeah, I mean I -- I -- now I know it was October 30th; and

23   that was the date that I spoke with the mediator; and that was

24   the date that he granted me permission for my client to appear

25   telephonically and for Mr. Freeman to appear on my behalf.

K18VUSHH                      Liebowitz - cross

1   Q.  Putting aside the date of October 30th, that specific, you

2   know, a number.  When the Court asked you in open court when

3   did you receive this permission, you didn't remember it was --

4   oh, it was right before, it was the night before the mediation.

5   You didn't remember that?

6   A.  Yeah, well, I went back to my email after the hearing.  And

7   I don't know the exact date, but I got -- I got permission from

8   the mediator prior to October 31st.  And it's accurate.  And

9   that's true.  I had a telephone call with the mediator on

10  October 30th.

11  Q.  Do you recall -- going back a little bit here.

12          Do you recall on October 4th, 2019, after attempting

13  to get permission for a telephonic mediation, the mediation

14  office wrote the parties to state this was not in accordance

15  with procedures given mediation in this Court?

16  A.  Yeah, I do remember getting some email from the mediation

17  office.

18  Q.  And do you recall they wrote that any permission to deviate

19  from mediation rules in this case would have to come from the

20  Court?

21  A.  Yes, I believe so.

22  Q.  I'm going to hand you --

23          MR. NEWBERG:  This is already in the record as Exhibit

24  3 to my declaration, your Honor.

25  Q.  It's an October 4th string of emails.  And Mr. Liebowitz,

K18VUSHH                        Liebowitz - cross

1    you recognize this string of emails?

2    A.  Yes, I recognize.

3    Q.  And do you recognize them being the emails where the

4    mediation office said that telephonic sessions would not be in

5    accordance with the procedures that govern this program; and

6    that you should seek appropriate relief directly from the

7    judge?

8    A.  Yes.  Telephonically meaning -- my interpretation of that

9    meant that -- that the -- yeah, I mean, the reason for this is

10   because I wanted to make sure to, you know -- you know, to have

11   the mediation before the initial conference, you know.  And I

12   thought that this would, you know, be a way to have -- a way to

13   try to resolve the matter before the initial conference.  And I

14   thought it would be successful for all of us to have a

15   telephonic mediation, and that's why I requested it.

16   Q.  But you understood at this point that the mediation office

17   was telling you that if you wanted relief from the rules, your

18   client to attend in person or lead counsel not to attend, any

19   relief from the rules would have to come from the Court?

20          THE COURT:  Yes or no.

21   A.  If that's what the email says, then that's what it says.

22   Q.  Did you understand that?

23   A.  Yes, I understand.

24   Q.  I'm going to hand you a letter that you filed with this

25   Court requesting telephonic mediation.

K18VUSHH                          Liebowitz – cross

1              THE COURT:  Docket number 12.

2    Q.  Yes, docket number 12.

3              Is this a letter you wrote the Court asking for

4    permission to have a telephonic mediation?

5    A.  Yes, this is my letter.

6    Q.  Now, in that request, you never asked for you not to have

7    to attend as lead counsel; correct?

8    A.  No.

9    Q.  You simply asked for the conference to be held via

10   telephone, right?

11   A.  Yes.

12   Q.  In fact, you asked that if the mediation could not be

13   telephonic, that more time be given to hold an in-person

14   mediation; correct?

15   A.  Repeat the question.

16   Q.  You asked that if the mediation could not be telephonic,

17   that more time be given to hold an in-person mediation;

18   correct?

19   A.  Yeah.  If that's what I said, then that's what I said.

20             THE COURT:  Now, this was submitted to me on October

21   4th; is that correct?

22             THE WITNESS:  Yes, October 4th.

23             THE COURT:  And the initial conference at that point

24   was scheduled for October 10th; correct?

25             THE WITNESS:  Yes.

K18VUSHH                    Liebowitz - cross

1          THE COURT:  And are you aware that my order required

2     mediation to be conducted at least two weeks prior to that

3     date?

4          THE WITNESS:  Yes.

5          THE COURT:  And you had not taken steps to comply with

6     that requirement, had you?

7          THE WITNESS:  Well, I don't know the exact date of

8     when counsel appeared, but I know that it was a short period of

9     time, relatively, between when opposing counsel appeared and

10    when the initial conference was scheduled.  And we were not

11    assigned a mediator after opposing counsel appeared.

12         So doing due diligence, I wanted to write to the Court

13    and try to get more time or potentially have the matter be done

14    telephonically, which sometimes is done in this courthouse.

15    And I thought that it would be successful via telephone, and

16    that's the reason why I suggested that to the Court.

17         THE COURT:  But you didn't ask for permission to

18    conduct the mediation after the deadline that I had set by

19    order, did you?  In other words, you didn't seek an extension

20    of the deadline for any of the reasons you just described.

21         THE WITNESS:  We respectfully request to either have

22    the mediation scheduled for October 8 via telephone, or to

23    schedule a mediation for another time in October.

24         THE COURT:  But an October 8th mediation, even if that

25    permission had been granted, was not in compliance with my

K18VUSHH                        Liebowitz - cross

1    order, which required it to be conducted two weeks prior to the

2    initial conference; correct?

3              THE WITNESS:  Yes.  No, that I understand.

4              THE COURT:  All right.  Thank you.

5              THE WITNESS:  But it was -- it was -- opposing counsel

6    appeared, I don't know the exact date, but it was sometime very

7    close to, I believe, the two-week deadline.  And the mediation

8    office did not assign a mediator.

9              THE COURT:  All right.  I got it.  Go ahead.

10   BY MR. NEWBERG:

11   Q.  In any case, the Court rejected your request for a

12   telephonic mediation; correct?

13   A.  Yes, rejected telephonic.

14   Q.  And that was on October 7th, do you remember that?

15   A.  I don't know the exact date.

16   Q.  Let me hand you the Court's order.  This is docket 13.

17             MR. NEWBERG:  It's an ECF docket order, so there's no

18   documents.  I've submitted my ECF notice, your Honor, that was

19   sent to me.

20   Q.  Do you recognize this as the Court's order denying the

21   telephonic mediation?

22   A.  It looks like it, yes.

23   Q.  Okay.  But the Court did give an extension of time to

24   conduct the mediation until October 31st; correct?

25   A.  Yes.

K18VUSHH                    Liebowitz - cross

1    Q.  And it says at the bottom:  The parties shall conduct the

2    in-person mediation no later than October 31, 2019.

3    A.  Yes, I see that.

4    Q.  And to be clear, when you say in your response papers that

5    you asked for permission, you're not talking about this

6    permission that was rejected; correct?  You're talking about

7    what you now say was an October 30th permission?

8    A.  I don't understand your question.

9    Q.  Okay.  You said in your papers you asked for permission

10   prior to the mediation.  I just want to be clear whether or not

11   you're referring to this request for permission.

12   A.  Yeah, I -- I -- I said what I said.

13            THE COURT:  But the request for permission that you

14   referenced in your declaration, filed in opposition to the

15   defendant's motion, that was a reference to the request for

16   permission from the mediator to send Mr. Freeman and to have

17   Mr. Usherson participate by telephone, not a reference to this

18   letter that you submitted to me; is that correct?

19            THE WITNESS:  I'm confused.

20            I don't know what you're talking about.

21            THE COURT:  Okay.  Let me show you your declaration

22   and direct your attention to paragraph 13 of that declaration,

23   where you state:  Prior to October 31st, 2019, the mediation

24   date scheduled in this case, I sought and received approval

25   from the mediator for Mr. Usherson to attend, and so forth.

1           That is a reference to your conversation with the

2    mediator, not to this letter that you filed with me; correct?

3           THE WITNESS:  Yeah, this is -- this is -- yeah, this

4    is different.

5           THE COURT:  Okay.

6    BY MR. NEWBERG:

7    Q.  And not to the permission you asked the mediator before you

8    sent this letter to the Court; correct?

9    A.  The phone call with the mediator happened on October 30th.

10   Q.  Okay.  So after receiving this order requiring an in-person

11   mediation, the parties also received an email from the

12   mediation office confirming an in-person mediation; is that

13   correct?

14   A.  I believe so.

15   Q.  And they said on October 7th that Judge Furman has extended

16   the time to mediate to October 31st, and ask the parties to

17   contact the mediator to "arrange for an in-person session, in

18   accordance with the judge's direction."

19          Do you remember receiving those instructions?

20   A.  I believe so, yes.

21   Q.  So after receiving this order from the Court and these

22   instructions from the mediation office, what did you think was

23   required?

24   A.  Yeah.  My interpretation of the order was -- when it said

25   "in-person," is that counsel for the parties need appear in

1   person, and that was my interpretation.  And then I -- and you

2   look at the S.D.N.Y. mediation rules, the rules say you could

3   ask the -- ask the mediator for permission for his or her party

4   to appear telephonically.  And that's exactly what I did.

5   Q.  That's not what you asked for to the Court.  You just asked

6   the Court for a telephonic mediation; correct?

7   A.  Yeah, telephonic at the time because it was getting close

8   to the initial conference.  And I thought that the mediation

9   with all the parties on the telephone and counsel on telephone

10  would be productive; and that the parties would reach a

11  settlement and try to save some expense and have the mediation

12  prior to the initial conference.

13  Q.  But my question is you didn't tell the Court, when you

14  asked for permission, I just want -- I'm asking for a

15  telephonic conference for lead counsel or the party, you just

16  said a telephonic conference; correct?

17  A.  Yeah, just telephonic conference.

18  Q.  And the Court denied that and said it had to be an

19  in-person mediation; correct?

20  A.  Yeah, in-person.

21  Q.  So who did you think had to be in person?

22  A.  Yeah, in person, according to the mediation rules, is trial

23  person who's going to prepare --

24  Q.  Mr. Liebowitz, you had a court order at this point saying

25  you needed in-person mediation.  Who did you think at the time

K18VUSHH                    Liebowitz - cross

1   the Court was referring to when it said you needed to have an

2   in-person mediation?

3   A.   In-person, meaning counsel.

4   Q.   Not parties?

5   A.   Not parties.

6   Q.   And did you ever seek to clarify this with the Court?

7   A.   I didn't seek to clarify it because that's my assumption of

8   what I believed "in-person" meant.  And then according to the

9   mediation rules, which is what I, you know, looked at and have

10  done in the past, and routinely what magistrate judges in this

11  district often do in their rules was say that you could seek

12  the permission from either the mediator or from the assigned

13  magistrate judge, if a party resides more than 100 miles away,

14  they could get their permission for the client to appear

15  telephonically.  And that's what I did.

16          THE COURT:  You didn't seek Mr. Newberg's consent for

17  either of those things, did you?

18          THE WITNESS:  No, because that -- the rules say that

19  you have to get the mediator's permission for the parties to

20  appear telephonically, and that's what I did.

21          THE COURT:  All right.

22          MR. NEWBERG:  Sorry, your Honor.

23          THE COURT:  In the *Sadowski* matter, you declined to

24  grant consent to your adversary for permission for the client

25  to appear by telephone; correct?

K18VUSHH                    Liebowitz - cross

1          THE WITNESS:  Yeah.  But then the other side got the

2     permission from this mediator, and it was granted, and --

3          THE COURT:  But, in other words, you didn't respond

4     saying, My consent is irrelevant; you need to seek permission

5     from the mediator.  You declined to grant consent; correct?

6          THE WITNESS:  Well, I'm not responsible for them

7     looking at the rules.

8     BY MR. NEWBERG:

9     Q.  Do you recall my email to you after the court order

10    requiring an in-person mediation, giving you various dates and

11    asking you to pick a date that you and Mr. Usherson could be in

12    New York and attend the mediation?

13    A.  I believe I saw that email.

14    Q.  And you immediately, within a few minutes of me sending

15    that email, responded and chose October 31st; correct?

16    A.  I believe, yeah.  Yes.

17    Q.  And that was the last possible day under the Court's order;

18    correct?

19    A.  Yes.

20    Q.  Did you check with Mr. Usherson that October 31st would

21    work for him to get to New York before you chose that date?

22    A.  Yeah, I believe so.

23    Q.  But you had not submitted any emails between you and

24    Mr. Usherson to the Court; correct?

25    A.  No.

K18VUSHH                           Liebowitz - cross

1    Q.  How did you communicate that to Mr. Usherson?

2    A.  Yes, by telephone.

3    Q.  So by telephone, between 3:29 p.m. on October 7th, and 4:22

4    p.m. on October 7th, you confirmed with Mr. Usherson that he

5    could be in New York on October 31st?

6    A.  Yes, if necessary.  And I did say that -- you know, that

7    often these courts allow parties to appear telephonically if

8    they live more than 100 miles away; and that in this case it

9    shouldn't be a problem.  I had a relationship with this

10   mediator; he's approved clients to appear telephonically five

11   other times; and I was sure that this would not be -- would be

12   the same thing.

13   Q.  So you didn't respond to me when I said, Hey, here's some

14   dates.  When can you and Mr. Usherson be available in New York?

15   You didn't respond saying, Well, I'm going to ask the mediator

16   for Mr. Usherson to appear telephonically.

17   A.  Yeah.  I mean, the rules say you have to get the mediator's

18   permission.

19   Q.  That's not my question.

20          My question is you didn't respond to me when I said,

21   Here's some dates.  When can you and Mr. Usherson be in New

22   York?  You didn't respond to me saying, I'm actually going to

23   ask for him to appear telephonically.

24   A.  Yeah.  If I didn't ask, I didn't ask.  But I didn't believe

25   it was necessary.

K18VUSHH                    Liebowitz - cross

1              THE COURT:  Just yes or no.

2              THE WITNESS:  No.

3              THE COURT:  Thank you.

4   Q.  And if you had a networking event scheduled for Los Angeles

5   the night of October 30th, why did you pick the October 31st

6   date?

7   A.  Because I was available then.

8   Q.  You viewed that as an available date, even though you had a

9   marketing event on the night of --

10  A.  It wasn't a marketing event.

11  Q.  I'm sorry, a networking event?

12  A.  Yeah, a networking event.

13  Q.  That you were hosting?

14  A.  Yeah, the night before.  It was no problem.  The next day

15  I'm available.

16             THE COURT:  What time was the networking event

17  scheduled for?

18             THE WITNESS:  I forgot the time, but it was in the

19  early evening.

20  Q.  Do you know when it was over?

21  A.  I don't know the exact time, no.

22  Q.  Do you know when the last flight was out of Los Angeles

23  that night?

24  A.  It was, I think they had a red-eye at, you know, midnight

25  or 1 a.m.  I mean, I don't know.

K18VUSHH                          Liebowitz - cross

1    Q.  Are you actually aware of that or are you speculating?

2    A.  Yeah.  No, I go to California; I know these flights.

3    Q.  So you believe there was a red-eye coming back after

4    midnight, midnight or 1 a.m.?

5    A.  I believe so.  I mean, this is -- or they add flights from

6    California to New York, I believe it's very often.

7            And -- but, as I said all along, the mediator granted

8    my client to appear telephonically, and granted Mr. Freeman to

9    appear on my behalf, just like in other mediations.

10           THE COURT:  Okay.  I got it.

11   Q.  Not to get into semantics, Mr. Liebowitz, but if you

12   actually got a 1 a.m. red-eye, with the time change, doing the

13   math, you wouldn't have been able to make an early morning

14   mediation --

15   A.  Of course I would.  I think it would have gotten in about

16   6:30.

17           MR. FREEMAN:  Objection, your Honor.

18           It wasn't early morning.  He's misrepresenting the

19   record.  It was a noon mediation.

20           MR. NEWBERG:  I'll strike that.

21           THE COURT:  In any event, it would have to be a

22   supersonic flight to get here by 6 a.m.

23           MR. NEWBERG:  Thank you, your Honor.

24   BY MR. NEWBERG:

25   Q.  I just have a couple more questions.

K18VUSHH                      Liebowitz - cross

1          I'm going to hand you what I have -- hand you what has

2     been entered already as Exhibit 8 to my declaration in this

3     case.

4          MR. NEWBERG:  Your Honor, I'll mention that this

5     particular exhibit does not have the mediator's name redacted;

6     but since we are not entering it, we're just referring to the

7     record, I assume that's okay for now.

8          THE COURT:  Yes.  The docket contains the document

9     redacted, so that is part of the record.

10          MR. NEWBERG:  Great.  Thank you.

11     BY MR. NEWBERG:

12     Q.  I'm going to present you with an email string here between

13     me and the mediator that goes from 8:15 p.m. to 10:03 p.m. on

14     the night of October 30, 2019, the night before the mediation.

15          Do you see at 8:15 p.m., where he says he talked to

16     you and you'd been tied up?

17     A.  Yes, I see that.

18     Q.  So he doesn't say you're out of town, right?

19     A.  Yeah, I don't see that.

20     Q.  And he says:  Hopefully, we can settle this before need to

21     go to in-person mediation.  Do you see that?

22     A.  Yes.

23     Q.  And then when I say in response to his statement about

24     in-person mediation that I would have assumed Mr. Usherson

25     either flew to New York tonight or is likewise on a very early

K18VUSHH                        Liebowitz - cross

1    plane, he responds:  I understand.  Do you see that?

2    A.  Yeah, I see that.

3    Q.  He doesn't say Mr. Usherson is not coming to the

4    deposition, does he?

5    A.  Yeah, I don't see -- he didn't say that.

6    Q.  Even though it's 10:03 p.m. on the night before the

7    mediation?

8    A.  Yeah, I can't speculate to what -- all I see here is that

9    he said "I understand."

10   Q.  And do you see anything in here that there's any indication

11   as of 10:03 p.m. the night before the mediation, that the

12   mediator had any idea that you or your client would not be at

13   the mediation?

14   A.  From this email chain?

15   Q.  Yes.

16   A.  No, I don't -- I don't see that.

17          But it was the mediator's obligation in -- you know,

18   to advise you, and I'm sorry that that didn't happen.  I

19   mean --

20   Q.  So this doesn't refresh your recollection that even on

21   October 30th at 10:03 p.m., the mediator had no idea you and

22   your client would not be attending the mediation?

23   A.  No, I didn't say that he didn't know.  I did tell him.  And

24   just because he said "I understand," I don't know what was

25   going through his mind when he wrote that email.

K18VUSHH                          Liebowitz - cross

1    Q.  I'm going to hand you Exhibit 9 to my declaration, which is

2    your email that you've testified about today sending revisions

3    to a proposal.  I'll represent the 4:12 a.m. is eastern time.

4    I assume that was 1:12 a.m. where you were on the west coast.

5              Do you recognize this email?

6    A.  Yes, I do.

7    Q.  And you say:  Attached please find revisions to the

8    agreement which can be discussed at the mediation.

9              Do you see that?

10   A.  Yes, I did.

11   Q.  So even then, you didn't mention you wouldn't be at the

12   mediation; correct?

13   A.  I never said that.  But I copied Mr. Freeman and the

14   mediator and you on the email.

15   Q.  Okay.  But you never said in this email, "I won't be

16   there"?

17   A.  No, because I had the conversation with the mediator the

18   night before.

19   Q.  And you never said in this email, even at 4:12 a.m. the

20   morning of the mediation, "My client won't be there"?

21   A.  No, because I told the mediator the night before.

22   Q.  And you mentioned Mr. Freeman is cc'd on this.  Am I

23   correct in stating this is the very first email in this case

24   that you sent to me where Mr. Freeman was cc'd?

25   A.  Oh, that I don't know.

K18VUSHH                    Liebowitz - cross

1    Q.  Are you aware as you sit here today of any other emails you

2    ever sent, any communications you ever sent in this case where

3    Mr. Freeman was cc'd?

4    A.  I don't know.

5    Q.  Do you know why you didn't have Mr. Freeman enter a notice

6    of appearance before the mediation?

7    A.  Yeah.  I mean, sometimes Mr. Freeman makes notice of

8    appearance and sometimes not.  It's never been an issue.

9    Q.  As you sit here today, do you still maintain that when

10   Mr. Freeman put in a sworn declaration that he'd never known

11   about the existence of this matter before 8 p.m. October 30th,

12   that was incorrect?

13   A.  Listen, I -- I don't -- I -- whether -- I believe we had

14   the conversation, you know, we -- we -- our office is --

15   offices are near each other.  And it could have been a brief --

16   you know, I do know that we -- you know, I did say that the

17   mediation, you know, was on the 31st; and that I did tell --

18   ask the mediator if Mr. Freeman could appear on my -- I'm

19   sorry, I did --

20   Q.  My question was why Mr. Freeman didn't enter a notice of

21   appearance.

22   A.  Yeah, because --

23   Q.  I'm sorry.  Actually my question was is it still your

24   testimony that Mr. Freeman's sworn declaration is incorrect?

25   A.  I'm not saying it's incorrect.  It could have been lack of

1    memories of what occurred, you know.  Not everyone is perfect

2    in this world.  You know, people forget.  And if I said I had a

3    conversation and he said we didn't, it's -- it's -- at the end

4    of the day, he was at the mediation prepared to settle the

5    case, where there were two lawyers in my firm prepared to

6    settle the case.

7    Q.  But is it your testimony that his sworn declaration is

8    incorrect or you simply don't remember who's correct?

9    A.  I believe the conversation -- I mean it -- it -- it -- it

10   could have been brief.  I mean it -- it -- it -- he was

11   prepared at the mediation that day to settle the case.  He was

12   fully aware of the fact --

13   Q.  That's not my question, Mr. Liebowitz.

14        MR. FREEMAN:  Your Honor, I believe we've already

15   covered this territory previously.  He's asking the same

16   questions over and over.

17        THE COURT:  Overruled.

18        Ask your question again.

19   BY MR. FREEMAN:

20   Q.  My question is, as you sit here today under oath in a court

21   of law, is it your position that Mr. Freeman's sworn

22   declaration is incorrect or that you don't remember who is

23   correct?

24   A.  I'm not saying --

25        THE COURT:  Mr. Liebowitz, let Mr. Newberg finish

1    please.

2    Q.  Or that you don't remember who is --

3    A.  I'm not saying that his declaration is incorrect at all.

4    Just my memory said that we had the conversation.  If his

5    memory said no, it -- it -- he was fully prepared that day to

6    have the mediation and negotiate in good faith to get to a

7    resolution.  And he was there.  He showed up with two lawyers.

8    It was Mr. Freeman and Ms. Liebowitz, and he was prepared to

9    settle the case that day.

10   Q.  And you've seen the mediator's declaration in this case;

11   correct?

12   A.  I believe so.

13   Q.  And you're aware in it he says you never asked for and he

14   never gave you permission for your client to attend

15   telephonically?

16   A.  I did see that.

17   Q.  And you're aware that in it he says he never gave you

18   permission for you not to attend and to send someone else in

19   your place?

20   A.  Say that again.

21   Q.  Are you aware he says in his declaration he never gave you

22   permission for you not to attend and to send somebody else?

23   A.  Yeah, I did see that.

24            MR. NEWBERG:  That's all I have, your Honor.

25            THE COURT:  All right.

K18VUSHH                        Liebowitz - cross

1              I have a couple more questions, and then limited

2      redirect.

3              First, I'm going to show you a document at docket

4      16-2; it's Exhibit 2 to Mr. Newberg's declaration.  And

5      beginning at page 3 of that document, this is an exchange of

6      emails in advance of the October 10th initial conference, the

7      conference of that subsequently adjourned regarding the

8      mediation that you were trying to schedule in that week; is

9      that correct?

10             THE WITNESS:  I don't understand the question.

11             THE COURT:  I'm just trying to set the context.

12             THE WITNESS:  Okay.

13             THE COURT:  This is an exchange of emails between you

14     and Mr. Newberg on October 3rd.

15             THE WITNESS:  Yes.

16             THE COURT:  In advance of what then was a conference

17     scheduled for October 10th.

18             THE WITNESS:  Yes.

19             THE COURT:  Okay.  And directing your attention to the

20     bottom of page 3, this is an email from Mr. Newberg at 10:04

21     a.m. on October 3rd.  He states:  I actually will be in New

22     York -- and for your convenience, I've underlined these -- on

23     Monday for a settlement meeting that will end around 3 p.m.  I

24     could be at the courthouse at 3:30 p.m., but I would have to

25     check with my client that he is available on such short notice.

K18VUSHH                       Liebowitz - cross

1   Is Mr. Usherson also available then?

2          Correct?

3          THE WITNESS:  Yeah, this is what he said.

4          THE COURT:  All right.  In an email later in the

5   chain, this is further on -- well, let me skip to page 2.  This

6   is an email from you later that morning at 10:28 a.m.  You

7   state at the end of that email:  If you have authority from

8   your client, just the lawyers can be on the phone.

9          Correct?  Page 2.

10          THE WITNESS:  Page 2.

11          THE COURT:  Do you see the email, 10:28 a.m.?

12          THE WITNESS:  Yes.

13          THE COURT:  You state:  We can do via phone if all the

14   parties agree.  And then:  If you have authority from your

15   client, just the lawyers can be on the phone.  Correct?

16          THE WITNESS:  Yes, that's what I said.

17          THE COURT:  That's in reference to the mediation?

18          THE WITNESS:  Yes, it must have been.

19          THE COURT:  And that's actually incorrect; correct?

20   You need permission from the mediator for the client not to

21   appear in person; is that correct?

22          THE WITNESS:  Yeah.  And the reason why I said that is

23   because --

24          THE COURT:  I'm just asking you based on your

25   testimony today, you understand that that is an incorrect

K18VUSHH                    Liebowitz - cross

1    statement of the mediation rules; that mediation rules require

2    a party to appear in person, but allow a mediator to grant

3    permission to appear telephonically; correct?

4              THE WITNESS:  Yes, if that --

5              THE COURT:  So it is incorrect to say that if you --

6    namely, defense counsel -- have authority from the defendant,

7    then just the lawyers can be on the phone, that's an incorrect

8    statement.

9              THE WITNESS:  Yeah, well, if the mediation -- that was

10   going to allow that, then that's --

11             THE COURT:  Where in the mediation rules is there

12   anything that states that with the permission of the parties,

13   that counsel can participate without the parties in the

14   mediation?

15             THE WITNESS:  I don't think so.

16             But the reason why is because also as a custom and

17   practice with this mediator, that not all the times were the

18   clients on the phone.  And it was between -- sometimes it was

19   just, you know, with the lawyers on the phone.

20             I want to say from the outset that, you know, this --

21   you know, the relationship with the mediator in this case, you

22   know, was very -- it was lax.  And, you know, that's why I

23   think that most of the time it was successful, because --

24             THE COURT:  All right.  Let me stop you there.

25             And then Mr. Newberg responded -- this is at 11:10

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K18VUSHH                    Liebowitz - cross

1   a.m. -- an email that begins on the bottom of page 1 and

2   continues to page 2, and drawing your attention to the top of

3   page 2, he states:  Also, the Court's rules are clear that all

4   parties must attend mediations without exception, and even

5   suggests that the mediation is pointless without the parties.

6   Our clients cannot simply give us authority.  The rules also

7   say that everyone must be there in person; although if a party

8   has a particular hardship, they may apply to attend

9   telephonically.  Do you see that?

10              THE WITNESS:  Yes.

11              THE COURT:  Then you responded to that email -- this

12   is on page 1 -- at 12:02 p.m. that same day; correct?

13              THE WITNESS:  I responded at 10:28.

14              THE COURT:  Well, you can't respond to an 11:10 email

15   at 10:28.

16              THE WITNESS:  Oh, I'm sorry.

17              THE COURT:  So that defies time/space relations,

18   but --

19              THE WITNESS:  Oh, I'm sorry, 12:02.

20              THE COURT:  Okay.  And you didn't say anything there

21   about the custom and practice with this mediator of allowing

22   clients to appear by telephone, did you?

23              THE WITNESS:  No, I never said that.  It was just

24   assumed that --

25              THE COURT:  All right.

1      And you didn't say anything in there about asking for

2  Mr. Newberg's consent to basically disregard that rule and

3  allow mediation with only lawyers, did you?

4      THE WITNESS:  No, I never said that.  But the custom

5  and practice, again, is the mediator --

6      THE COURT:  I got that already.

7      Let's talk a little bit about that custom and

8  practice.  That custom and practice is based on the five cases

9  that are cited in your letter of, I think, December 16th; is

10  that correct? correct?  The five cases that you referenced --

11      THE WITNESS:  If that was the date, that was the date.

12      THE COURT:  All right.  Well, the five cases that

13  Mr. Freeman asked you about earlier this morning?

14      THE WITNESS:  Yes.

15      THE COURT:  And is that the full universe of cases

16  that you had had mediations with this same mediator?

17      THE WITNESS:  I believe so.

18      THE COURT:  Okay.

19      And so in every case that you had had a mediation with

20  this mediator, your client had participated by telephone; is

21  that correct?

22      THE WITNESS:  On those five, and then this one, six,

23  the mediator --

24      THE COURT:  My question is are there any mediations

25  that you've conducted with this mediator where the client

K18VUSHH                          Liebowitz - cross

1   participated in person?

2           THE WITNESS:  I don't believe so.

3           THE COURT:  Did you make any sort of record of the

4   permissions that you received in those cases?

5           THE WITNESS:  I am not sure, but it was routine,

6   always --

7           THE COURT:  Is there any written record in your office

8   that you obtained permission?

9           THE WITNESS:  I don't believe so.

10          THE COURT:  Okay.

11          And how did you generate this list?  It was just a

12  list of all the mediations that you'd conducted with the

13  mediator?

14          THE WITNESS:  Yes, I believe so.

15          THE COURT:  Any other questions?

16          MR. NEWBERG:  I do.  Just a couple, your Honor.

17  BY MR. NEWBERG:

18  Q.  I just want to be clear.  You're saying it was the custom

19  and practice with this mediator to not even have clients appear

20  at all, not even on the phone?

21  A.  Sometimes, if -- if I had authority, you know, to settle,

22  then it wasn't necessary to get the client on the phone.  This

23  is very -- the reason why I recommended this mediator is

24  because I thought he was successful in the past, and that --

25  that we would get to a resolution.  And it was a very lax, you

1    know, relationship, and --

2              THE COURT:  I got it.

3              Turning to page 2 of docket number 41, I think that

4    is, is that a list of five cases, just to have it in front of

5    you?  Is it your testimony -- let me ask differently.

6              Did any of those mediations occur without the

7    participation of the client in any way, shape, or form; in

8    other words, by telephone or in person?

9              THE WITNESS:  I believe *Emerson* -- you know, we got to

10   an agreement fairly quickly, so I don't think -- I don't

11   think --

12             THE COURT:  Your recollection is --

13             THE WITNESS:  I don't -- I actually, on that one, I

14   don't even believe that -- oh, on *Emerson*, now I know.  I

15   believe the defense -- the defense counsel was there, not his

16   client, but I think he was -- they were available via

17   telephone.  I know that my client wasn't -- wasn't there.  So

18   in that case, the clients on both sides didn't appear.

19             THE COURT:  But your client didn't participate in any

20   way?

21             THE WITNESS:  No, I mean it was -- I had authority,

22   and he would have been available via telephone.

23             THE COURT:  It's a straightforward question.

24             In any of those five mediations, did the client not

25   appear in any -- at all?  In other words, did you participate

K18VUSHH                        Liebowitz - cross

1     without the participation of the client?

2               THE WITNESS:  They were all available by telephone.

3               THE COURT:  That's not my question.  I'm not asking

4     whether they were available.  I'm asking whether they appeared

5     in connection with the mediation, whether in person or via

6     telephone.

7               THE WITNESS:  That I don't know.  It could have been

8     in some of them, it was just so quick, that it wasn't, you

9     know, necessary to call.  And we were just hashing out the

10    nonmonetary terms.  I don't recall.  But oftentimes these

11    mediations were very short.

12              THE COURT:  Okay.

13              Anything else, Mr. Newberg?

14              MR. NEWBERG:  Yes.

15    BY MR. NEWBERG:

16    Q.  Just on this, I want to be clear what you're testifying in

17    sworn testimony to, Mr. Liebowitz.

18              Without being able to point to an actual case where no

19    clients attended by phone or otherwise, you're claiming that

20    this mediator, a mediator of this Court, was custom and

21    practice to completely violate the Court's mediation rules, is

22    that what you're testifying?

23    A.  I -- I don't understand your question.

24    Q.  You've said it was his custom and practice to not even have

25    clients appear at all, not even by phone.

K18VUSHH                    Liebowitz - redirect

1   A.  No, I -- I mean -- if -- if the lawyers have authority to

2   settle on behalf of clients, and the client's available via

3   telephone --

4   Q.  You didn't say that, Mr. Liebowitz, not the client's

5   available by telephone.  You asked me -- the Court asked you

6   about it -- if I had my client's consent, the client wouldn't

7   have to appear at all.  You didn't say, Be available by

8   telephone.  You said not participate; correct?

9   A.  Yeah, well, they are available via telephone.  And if we

10  got to a resolution and it wasn't necessary, I mean they are

11  available via telephone.  I mean this is -- this is what --

12  Q.  That's all I have.

13          THE COURT:  All right.

14          I think we need to take a break -- if not now, then

15  after the redirect, but how much -- do you have any redirect?

16          MR. FREEMAN:  Yeah.  It would just be a couple of

17  minutes.

18          THE COURT:  All right.

19          Let's finish that up quickly, and then we'll take a

20  break.

21          Go ahead.

22  REDIRECT EXAMINATION

23  BY MR. FREEMAN:

24  Q.  Thank you, Mr. Liebowitz.

25          So when did you graduate law school?

K18VUSHH                      Liebowitz - redirect

1    A.  I graduated law school, I believe, 2014.

2    Q.  And when did you first file your first case?

3    A.  I believe 2016.

4    Q.  Was it in January 2016?

5    A.  I believe so.

6    Q.  And you were admitted to the bar in September 2015?

7    A.  Yes.

8    Q.  And since that time, January 2016, approximately how many

9    cases has the Liebowitz Law Firm filed?

10   A.  Filed approximately 2,000.

11   Q.  2,000 --

12   A.  2,000 cases countrywide.

13   Q.  And at the time of the mediation, approximately how many

14   cases did you have pending on your docket?

15   A.  At the time of this mediation, it was definitely over 100.

16          THE COURT:  Hold on one second, counsel.

17          (Pause)

18          THE COURT:  All right.  You can proceed, counsel.

19   BY MR. FREEMAN:

20   Q.  Would it surprise you to know that at the time of the

21   mediation, you had -- the Liebowitz Law Firm had over 400 cases

22   pending in federal court?

23   A.  Yeah, that could be.  That could be.

24   Q.  And how many lawyers do you have employed, besides you, at

25   Liebowitz Law Firm?

1   A.  So I only have Mr. Freeman and now my sister,

2   Ms. Liebowitz, that just recently got admitted.  But that's it.

3   Q.  So essentially -- would it be accurate to state that you

4   essentially have two lawyers handling over 400 cases at one

5   time?

6   A.  Yes.

7   Q.  And is it your belief that that might explain why there

8   have been administrative failures on your part, as well as the

9   firm's part?

10          THE COURT:  Sustained as to form.

11   Q.  Since November of 2019, have you retained outside counsel

12   to help instruct you in terms of any matter?

13   A.  Yes.  I have retained a counsellor to help out on business

14   management and to help out with, you know, situations that may

15   arise and that could help with the practice.  Because it is --

16   there's a lot of cases, and it's -- we try our best, you know,

17   to -- to try to help, you know, the photography community.

18          And it's -- it's -- we are doing all we can now to fix

19   the mistakes that we've done in the past and make sure that

20   things don't happen again.  And I -- you know, I'm getting

21   advice from an outside lawyer on how to make things better and

22   how to clean up everything.  And I know that, you know, certain

23   things are not best practice, and I understand that.  And I

24   understand that things need to change.  And I am speaking with

25   a reputable lawyer to help out in these situations so that

1    things like this don't happen again; and that all the T's are

2    crossed and I's are dotted.  And I want to make sure that

3    everything is perfect with the courts and that things like this

4    don't happen again.

5              THE COURT:  And just out of curiosity, when you say

6    "things like this," what are you referring to?

7              THE WITNESS:  I'm just talking about, you know, best

8    practices, like, you know, getting things in writing, you know,

9    making sure that everything is calendared, making sure --

10   getting a system of -- a calendaring system, you know, trying

11   to get like a customized one, with the amount of volume that we

12   have, to just make sure everything is on the calendar when

13   things are due, when motions are due, when there's conferences,

14   when there's mediations.

15             And I'm in the process of putting all that together so

16   that, going forward, that nothing is missed and everything is

17   calendared, and making sure that things run smoothly going

18   forward.

19             MR. FREEMAN:  I have no further questions, your Honor.

20             THE COURT:  All right.

21        You may step down, Mr. Liebowitz.

22             (Witness steps down)

23             THE COURT:  Let's, in deference to the court reporter,

24   take a brief break.

25             I would assume that Mr. Newberg's testimony will be

1    relatively short.

2              MR. FREEMAN:  Yes, very short, your Honor, from our

3    side.

4              THE COURT:  Very good.  In that case, we'll stick with

5    the order.  And I feel a little bad that the mediator has been

6    stuck here all morning, but I think we'll stick with the order

7    in light of that.

8              Let's pick up again in, let's say, seven minutes, and

9    we'll go from there.  Thank you.

10             (Recess)

11             THE COURT:  All right.

12             Mr. Newberg, take the stand, and my deputy will

13   administer the oath to you.

14   BRAD R. NEWBERG,

15        called as a witness on his own behalf,

16        having been duly sworn, testified as follows:

17             THE COURT:  All right.  Cross-examination.

18   CROSS-EXAMINATION

19   BY MR. FREEMAN:

20   Q.  Good morning, Mr. Newberg.

21   A.  Good morning.

22   Q.  So during the cross-examination of Mr. Liebowitz, you had

23   introduced into evidence the procedures of the mediation

24   program, do you recall?

25   A.  Yes.

K18VUSHH                          Newberg - cross

1    Q.  Yes.

2              Is there anything in those rules which require

3    Mr. Liebowitz to advise you, opposing counsel, of whether or

4    not his clients are appearing telephonically or whether or not

5    his associate would appear in his stead?

6              THE COURT:  Counsel, the rules speak for themselves,

7    and you don't need to use the witness to make a legal argument.

8              MR. FREEMAN:  Fair enough.

9              THE COURT:  So let's just stick to the facts and keep

10   this as short as possible.

11             MR. FREEMAN:  Okay.  Great.

12   Q.  So I'd like to direct your attention -- do you recall on

13   November 6 submitting a declaration to the Court in support of

14   defendant's motion for sanctions?

15   A.  Yes, I do.

16   Q.  And do you recall that you -- that there was a paragraph in

17   your declaration where you discussed what happened when you

18   arrived at the mediation at 11:45 a.m.?

19   A.  I do.

20   Q.  And do you recall that you had a discussion with the

21   mediator before Liebowitz Law Firm's attorneys arrived?

22   A.  Yes.

23   Q.  Can you please explain to the Court to the best of your

24   recollection exactly what was said?

25   A.  Sure.  Obviously, besides pleasantries, in terms of this,

K18VUSHH                    Newberg - cross

1    the subject came up at some point where we were talking, and I

2    mentioned meeting Mr. Liebowitz in person, since I hadn't in

3    the past.  And it is my recollection that at that point, the

4    mediator had said, I just heard, the mediator said, late last

5    night or this morning, that Mr. Liebowitz isn't going to be

6    here.  He was clear he did not give permission for that, but

7    was just sort of told; he didn't say it in any way.

8              I asked him point-blank, I said, That's not

9    acceptable.  I assume Mr. Usherson would be here.

10             And he sort of gave a sigh.  He said, I don't know

11   anything about whether Mr. Usherson is coming or not.  And he

12   suggested that based on his experience with Mr. Liebowitz, but

13   not his experience of granting permission, his experience just

14   of Mr. Liebowitz being Mr. Liebowitz, he said he's not hopeful

15   about Mr. Usherson, but he expected him to be there.

16   Q.  So is it your testimony that Mr. Liebowitz's testimony that

17   he spoke to the mediator about obtaining permission, is your

18   testimony in your declaration, specifically paragraph 46 and

19   47, doesn't it corroborate Mr. Liebowitz's testimony that he

20   obtain permission?

21             MR. FORESTA:  Objection, your Honor.

22             THE COURT:  Sustained.

23   Q.  At the time that the mediator advised you that

24   Mr. Liebowitz would not be attending, did you object to

25   proceeding with the mediation?

```
1    A.  I did.  I stated that I did not think -- I stated that
2    there was a court order that there had to be an in-person
3    mediation.  He was expected to be there.  His client was
4    expected to be there.  And I did not think the mediation could
5    proceed without the parties and counsel being there.
6    Q.  And what was the mediator's response to that objection?
7    A.  The mediator's response was that he understood completely.
8    Q.  Did the mediation proceed?
9    A.  I would not really say that the mediation proceeded.
10          You arrived, Mr. Liebowitz's sister.  I made clear my
11   displeasure with the violation of the court rules.  And I spoke
12   to my client.  We decided, You know what?  We're here.  We'll
13   make an offer.  You went to see if you could get your client on
14   the phone --
15          THE COURT:  We're veering beyond the subject matter of
16   the hearing, so next question.
17          MR. FREEMAN:  I got you.  Okay.
18   Q.  I want to move to another topic then.
19   A.  Sure.
20   Q.  After defendant -- after the defendant's motion for
21   sanctions was fully briefed, is it correct that your client
22   settled the case?
23   A.  It is correct.
24   Q.  Yes.
25          And did you, on behalf of your client, sign a
```

K18VUSHH                      Newberg - cross

1    stipulation stating that all parties would bear their own costs

2    and attorneys' fees?

3              THE COURT:  Sustained.  This is not relevant to the

4    subject matter of this hearing.  And it's also a matter of

5    record if he did or didn't.

6              Can I go back to the conversation that you had with

7    the mediator when you arrived at the mediation.

8              Is it your testimony that he specifically said that he

9    had not granted permission for Mr. Liebowitz not to appear in

10   person?  In other words, can you tell me --

11             THE WITNESS:  I did not ask the question, Did you give

12   permission.  Your Honor, I cannot answer that question with 100

13   percent surety that it would be accurate whether he said the

14   words "I did not grant permission."  It was very clear that he

15   was simply notified.  He did not say he gave permission, and he

16   said -- he said, I was notified.  I don't even necessarily know

17   what that means.  It could have been a voicemail.

18             THE COURT:  And did he say anything about Mr. Freeman

19   or another lawyer appearing instead of Mr. Liebowitz?

20             THE WITNESS:  He said -- when he said, I was informed

21   he's not going to be here, he said he's sending an associate of

22   his.

23             THE COURT:  Go ahead.

24             MR. FREEMAN:  I have no further questions, your Honor.

25             THE COURT:  All right.  Any redirect?

K18VUSHH                        Newberg – cross

1          MR. FORESTA:  Nothing, your Honor.

2          THE COURT:  All right.

3          MR. FORESTA:  Thank you.

4          THE COURT:  I have a couple questions, actually.

5          You had a conversation with the mediator after Mr.

6    Liebowitz filed his opposition to your motion; is that correct?

7          THE WITNESS:  That is correct, your Honor.

8          THE COURT:  Am I correct that was on or about November

9    19th?  Does that sound right?

10          THE WITNESS:  That sounds accurate, your Honor.  I

11    would stand by my declaration which was drafted soon

12    thereafter.

13          THE COURT:  I appreciate looking at me, but more

14    important to speak into the microphone.

15          And during that conversation, did the mediator tell

16    you about his communications with Mr. Liebowitz in advance of

17    the mediation?

18          THE WITNESS:  No, he did not.  He actually

19    specifically said that he did not grant permission.  He did not

20    at that point raise this idea of how he was informed.  He just

21    told me that he had granted permission for these two things in

22    other cases, but he was adamant that he did not in this case.

23          THE COURT:  Okay.

24          Did he tell you during that conversation that he had

25    been informed that Mr. Liebowitz would not be appearing in

K18VUSHH                          Newberg – cross

1    person and was sending an associate?

2             THE WITNESS:  I do not recall, but I don't think so.

3             THE COURT:  Okay.

4             All right.  I have no further questions.

5             I think you can step down, and we can put the

6    mediator -- well, either put him out of his misery or put him

7    into further misery, I don't know, but let's call the mediator.

8             (Witness steps down)

9             MR. FREEMAN:  Your Honor, I have a logistical issue to

10   raise with the Court.

11            Regarding the mediator's testimony, we do want to get

12   into the custom and practice evidence.  If it pleases the

13   Court, we'd just like to submit the five docket sheets to the

14   witness at the outset, if that's okay.

15            THE COURT:  That's fine.

16            MR. FREEMAN:  Okay.

17            MR. NEWBERG:  And, your Honor, the order states that

18   you'll go first; and then I don't know who you want --

19   Mr. Liebowitz's counsel, Mr. Freeman, or I -- to go next.

20            THE COURT:  I'm sorry, say that again.

21            MR. NEWBERG:  Your order says that you will be going

22   first.  I assume that's still the process.  And I don't know

23   which of the sides you want to go next.  I don't know if you

24   want to decide that on the fly or now.

25            THE COURT:  I will start, and then why don't I give

K18VUSHH                    Mediator - direct

1   you, at this stage, thereafter, and then Mr. Freeman

2   thereafter.  All right?

3           MR. NEWBERG:  Thank you.

4           THE COURT:  Sir, you can step up to the witness box.

5   THE MEDIATOR,

6       called as a witness by the Court,

7       having been duly sworn, testified as follows:

8   DIRECT EXAMINATION

9   BY THE COURT:

10  Q.  I will provide the name to the court reporter for the

11  record, but will not mention it here to preserve

12  confidentiality.  And I'll refer to you just as "the mediator,"

13  rather than by name.  So thank you for joining us, sir.  And

14  I'm sorry for keeping you waiting all this morning.  I

15  appreciate your presence here and your patience.

16          Let me ask you some questions about your declaration

17  in this matter and your experience with Mr. Liebowitz.

18          Let me start with your relationship and prior

19  experiences with Mr. Liebowitz.

20          First of all, do you have any relationship with him

21  outside of the mediations that you've conducted?

22  A.  No, I've only -- sorry.  I've only met Mr. Liebowitz

23  through the mediation process.

24  Q.  All right.  And approximately how many times have you

25  conducted mediations in his cases?

1    A.  Approximately a half a dozen or so.

2    Q.  And when was the first time, approximately?

3    A.  Six to nine months ago.

4    Q.  All right.  So in 2019?

5    A.  Yes.

6    Q.  And in each of those -- and in the half dozen or so that

7    you've conducted, how many has he appeared in person?

8    A.  Certainly the majority of them.

9    Q.  And when he did not, who appeared instead?

10   A.  His associate.

11   Q.  And in those cases where his associate -- sorry, by

12   "associate," is it Mr. Freeman who's sitting at the front

13   table?

14   A.  Yes.

15   Q.  In those cases where Mr. Freeman appeared and Mr. Liebowitz

16   did not, did you know in advance that Mr. Freeman would be

17   appearing?

18   A.  I think there were two -- two times that Mr. Freeman

19   appeared.  The first time he -- I had no idea.  And the second

20   time, which would have been this -- this case, I don't think I

21   knew he appeared.  Except after I gave my declaration, just to

22   be clear, I looked at my emails and whatever.  And I noticed

23   just prior to the mediation, that I recognized that

24   Mr. Liebowitz was in L.A. at the time, I think it was 48 hours

25   before the actual mediation.  So it's possible that I could

1   have presumed he might not be there.

2   Q.  Okay.  So prior to this case, there had been one other

3   occasion where Mr. Freeman appeared?

4   A.  That's my best recollection.

5   Q.  And in any of the other cases -- put aside this case for a

6   moment -- did you know who was the lawyer who would be

7   primarily responsible for handling trial, if the case were to

8   go to trial?  Was there any discussion about that?

9   A.  There wasn't any discussion about that.

10  Q.  Okay.  And putting aside this case, again, in any of the

11  other cases, did the client appear with Mr. Liebowitz or

12  Mr. Freeman?

13  A.  Sometimes the client appeared.  Sometimes, because of the

14  travel issues, the client didn't appear, but he was -- the

15  client -- I think it was all males -- were always available by

16  phone.  And Mr. Liebowitz had full authority to settle this

17  case.  And if the case was at a point of settlement, I would

18  talk to the client to make sure that Mr. Liebowitz had full

19  authority in that vein.

20  Q.  Okay.  And in the cases -- again, putting this case aside

21  for a moment, where the client did not appear in person, did

22  you know that in advance of the mediation?

23  A.  On a few occasions I did, on some occasions I didn't.

24  Q.  And where you didn't, in other words, you showed up at the

25  mediation expecting the client to be present to find that the

1  client was not?

2  A.   That happened, but I was assured that Mr. Liebowitz had

3  full authority to settle; and that the client would be

4  available on the telephone to answer any questions or to -- if

5  there was going to be a settlement, to affirm that the

6  settlement was in place.

7  Q.   Okay.  But to be clear, my question is prior to this case,

8  there were -- there was at least one mediation where you

9  appeared at the mediation expecting the client to be there,

10  only to find that the client was not present in person?

11  A.   Yes, that's correct.

12  Q.   All right.

13       And are there occasions prior to this case where you

14  arrived at the mediation knowing that the client would not be

15  appearing in person, but participating by telephone?

16  A.   I really don't recall.

17  Q.   All right.

18       In other words, do you recall any -- do you know of

19  any other case Mr. Liebowitz or Mr. Freeman requesting

20  permission from you for the client to participate by telephone?

21  A.   Maybe in one instance.  That was where the client was

22  actually out of the country, would be prohibitively expensive

23  for him to come here for a mediation session.

24  Q.   All right.

25       And on that occasion did you make any record of that

1   fact?  Do you know if it was memorialized in any fashion?

2   A.  No, it wasn't memorialized.  I actually did -- the

3   mediation turned out to be successful.  And I talked to the

4   client; Mr. Liebowitz got him on the telephone.  I told him to

5   ascertain the settlement was -- was appropriate and agreeable.

6       And I should add that in no instance where in the

7   mediation, when we reached agreement, did Mr. Liebowitz not

8   follow through.

9   Q.  Okay.  Now, in this case, turning to this case, you spoke

10  to Mr. Liebowitz the night before the mediation on October

11  30th; is that correct?

12  A.  I believe it was October 30th.  We actually had a couple of

13  discussions, as well as with the defendant's counsel, because

14  there was a possibility that the case would settle without

15  mediation.  The defendant's counsel was in Virginia or so at

16  the time, and it could settle without actually having a

17  mediation.  Obviously that would be advantageous.

18  Q.  All right.  So I want to focus for a moment on whether

19  there were any communications with Mr. Liebowitz prior to

20  October 30th, so earlier than October 30th.  Do you recall?

21  A.  The only -- to go back a little bit, sometime early October

22  I completed a mediation with Mr. Liebowitz.  And I got a call

23  from him asking if I would mediate a case, they're under some

24  time pressures, name a mediator.  And I said if it's okay with

25  the mediation office, I would do it.

1            Further asked -- and I think it was on that same phone

2     call -- whether that mediation could take place by telephone,

3     since he knew that the plaintiff -- sorry, the defendant's

4     counsel was in Virginia.  And again, he said there's an expense

5     involved there, and if we can avoid it.

6            And I said as long as the mediation office said it was

7     okay, I had no problem with that.

8            Subsequently, I got a call from the mediation office

9     asking that the mediation be done in person rather than by

10    telephone.  I said that's fine as well.

11           I communicated with, I think, Mr. Liebowitz and

12    defendant's counsel.  And this was something I always ask, give

13    me a couple of dates that are agreeable to you, and I'll look

14    at my calendar and we can then have the mediation.  It's got to

15    be in person.  And I left it to the parties to work out those

16    details.

17    Q.  All right.  And at some point it was then set for October

18    31st at the courthouse; is that correct?

19    A.  That's absolutely correct.

20    Q.  All right.

21           So between the aborted telephone conference, if you

22    will, in early October, and the October 31st -- at any point

23    after the October 31st conference was scheduled, did you have

24    any telephone calls with Mr. Liebowitz prior -- between that

25    date and October 30th?

K18VUSHH                          Mediator - direct

1   A.  I don't recall that.  The only conversation I had, again,

2   was with the mediation office informing them that the

3   respective parties had agreed on the 31st.

4   Q.  All right.  And then on October 30th, you had one or more

5   than one conversation with Mr. Liebowitz?

6   A.  There were more than one.  And I also talked to Mr. Newberg

7   at that time because, again, the parties weren't all that far

8   apart and, again, can avoid coming in -- if they can avoid

9   coming in, that would be fine.

10  Q.  And on that date, on October 30th, did you know where

11  Mr. Usherson, the plaintiff in this matter, was located?

12  A.  I had no idea.

13  Q.  Did Mr. Liebowitz say anything about the location of

14  Mr. Usherson in his calls with you on October 30th?

15  A.  Not that I recall.

16  Q.  And to your knowledge, I take it, you didn't say anything

17  about Mr. Usherson's whereabouts or residence prior to October

18  30th either?

19  A.  No.

20  Q.  All right.

21          Do you remember when your last conversation was with

22  Mr. Liebowitz on October 30th?

23  A.  It was sometime either late afternoon or early evening.

24  Without going into the specifics, it looks like they could have

25  reached a settlement.  Mr. Newberg had said that -- let's say

1    the dollar amount was probably acceptable, but he wanted a

2    written settlement agreement.

3    Q.  Let's skip over the substance of the negotiations, if you

4    will, just because that's beyond the scope of what we're doing

5    here.

6           Your testimony is that your last conversation with

7    Mr. Liebowitz was in late afternoon or early evening of October

8    30th?

9    A.  That's correct.

10   Q.  How long did that call last, to your recollection?

11   A.  Less than ten minutes.

12   Q.  And do you know where Mr. Liebowitz was at the time?

13   A.  At the time I did my declaration, I did not.  He has a

14   number that you can't tell, because it's 646, as I remember.  I

15   don't know where that is.  But I believe at one point in time I

16   became aware that he was -- he was out of state.

17   Q.  And your recollection is that at some point prior to the

18   mediation, you became aware that he was out of state?

19   A.  Yes, that's -- my records indicate that.

20   Q.  And your records, is there some email referencing --

21   A.  An email, yeah.

22   Q.  And referencing that he was in Los Angeles?

23   A.  Yes.

24   Q.  And at that time -- do you remember when that email was

25   from and --

1   A.  It would have been from Mr. Liebowitz saying, Call me,

2   again, trying to see if the dispute had been finalized to a

3   resolution.

4   Q.  And did the email say, Call me, I'm in Los Angeles, or

5   something to that effect?

6   A.  I think it said, Call me, and I had his number.  But I

7   became aware prior to that time, whether it was on the 30th or

8   before that, that he was -- he was out of state.

9   Q.  And I'm just trying to pin down how you became aware of

10  that fact.

11  A.  He may have told me or whatever, you know, I have no

12  present recollection.  But from the email correspondence, it

13  seems to indicate I knew he was in L.A.

14  Q.  All right.

15          And in that last conversation where you said it was

16  less than ten minutes, again, I don't want you to get into the

17  substance of the negotiations, just the, sort of, logistics of

18  the appearances the next day, what did he say and what did you

19  say that you recall?

20  A.  On the 30th, the last conversation?

21  Q.  Yes.

22  A.  On the last conversation I had, I said, again, in

23  substance, that the numbers would be agreeable, the numbers

24  were.  But it's not going to happen prior to the mediation

25  unless both sides have a written stipulation settling all

matters.  There were some outstanding matters that Mr. Newberg

in particular wanted to make sure it was pinned down.

Q.  Let me just be clear.  What I'm asking is how did you leave

things?  Was there a discussion that you would have a further

conversation; that you would resume the conversation at the

mediation the next day?

A.  The actual last conversation I had with Mr. Newberg

explaining where we were, and Mr. Newberg had said that

basically unless we have writing, I'll see you tomorrow.

        I said, Okay.  I'll see you at 11 o'clock tomorrow.

Q.  Okay.  And then the communications you had with

Mr. Liebowitz on October 30th, did he say anything one way or

another about whether he would be appearing at the mediation on

the 31st?

A.  I frankly don't recall.

Q.  You don't recall one way or another?

A.  One way or another.

Q.  Did he ask your permission not to appear himself?

A.  No.  But, again, on prior occasions, because I've done

several mediations now, his associate always seemed fully

knowledgeable on the cases that he appeared.

Q.  All right.  And on those occasions, you had not -- I take

it you had, sort of, blessed the arrangement, that is to say

proceeded with the mediation, even if Mr. Liebowitz hadn't

obtained your advanced permission to send Mr. Freeman?

K18VUSHH                    Mediator - direct

1   A.  Yeah.  As long as the -- talked to defendant's counsel, as

2   long as I assured them, and Mr. Liebowitz's associate assured

3   them that he had full authority to settle the case, then we can

4   proceed on that basis.

5   Q.  All right.

6          Turning back to October 30th, did Mr. Liebowitz make

7   any reference to Mr. Freeman in your conversations with him?

8   A.  I don't recall.

9   Q.  You don't recall one way or another?

10  A.  One way or the other, sorry.

11  Q.  Did he make any reference to his sister one way or another?

12  A.  His sister?

13  Q.  Yes.

14  A.  I don't recall that at all.

15  Q.  All right.

16         And did he make any reference to Mr. Usherson's

17  participation in the mediation?

18  A.  No.

19  Q.  Did he ask your permission for Mr. Usherson to appear by

20  telephone?

21  A.  No.

22  Q.  And again, your testimony is that he made no reference to

23  Mr. Usherson's whereabouts, where he was?

24  A.  That's correct.  Mr. Usherson's -- where he was was just

25  not part of the conversation.

K18VUSHH                     Mediator - direct

1    Q.  All right.

2    A.  I mean, I could add, if you'd like.  The first time I heard

3    anything was at the mediation with Mr. Newberg, who said we

4    picked the 31st specifically because Mr. Usherson would be

5    there and presumably Mr. Liebowitz would be there, but I wasn't

6    part of those conversations.

7    Q.  Okay.  If Mr. Liebowitz had told you that Mr. Usherson

8    would be participating by telephone, would you have made any

9    record of that?

10   A.  You mean written record?

11   Q.  Yes.

12   A.  No.  I might have told Mr. Newberg that, you know, we're

13   proceeding tomorrow, but I usually don't make a written record

14   on pre mediation.

15   Q.  All right.

16          And when you say you might have told Mr. Newberg,

17   would you have told Mr. Newberg or you're not sure?

18   A.  I'm not sure.  But, you know, we had conversations, I say,

19   relating to the substance of it, I might have mentioned it to

20   him.

21   Q.  All right.

22          Let me show you -- one moment.

23          Showing you docket number 16-8, Exhibit 8 to

24   Mr. Newberg's declaration, do you want to just take a quick

25   look at that.  And directing your attention to the bottom of

1     that exhibit.

2     A.  Talked to Richard.

3     Q.  There's an email from you to Mr. Newberg stating that you

4     had spoken to Richard and he has been tied up.  That's

5     Mr. Liebowitz, I assume?

6     A.  Yeah.

7     Q.  And he will review tonight and get back to us in morning.

8     Hopefully, we can settle this before a need to go to in-person

9     mediation.  You sent that email to Mr. Newberg?

10    A.  Yes.

11    Q.  So that's at 8:15 p.m.

12            Did you send that email following your final

13    conversation with Mr. Liebowitz, do you recall?

14    A.  That would refresh my recollection at that point, yes.

15    Q.  And do you have any recollection of how long after your

16    conversation you would have sent this email?  Was it --

17    A.  Right away.

18    Q.  Very good.

19            And then Mr. Newberg responds with your name, and

20    then, I'm headed to the train station well before 6 a.m.  And

21    to be candid, I would have assumed Mr. Usherson either flew to

22    New York tonight or is likewise on a very early plane.

23            Do you see that?

24    A.  Yes.

25    Q.  And you understood Mr. Usherson was the plaintiff in this

K18VUSHH                          Mediator - direct

1   matter?

2   A.  Oh, yes.

3   Q.  And you responded, this is at 10:03 p.m. on October 30th:

4   I understand.  Yes?

5   A.  Yes.

6   Q.  Now, would you have -- if you had known that Mr. Usherson

7   was not planning to attend, would you have said something to

8   that effect in that email?

9   A.  Probably, given what Mr. Newberg said.  But I -- you know,

10  I want to be candid, it's -- it's looking backward.

11  Q.  All right.  Candor is a good thing in this context.

12          And at what point did you -- did you learn that

13  Mr. Usherson was not coming?

14  A.  When the mediation started at 11 a.m.

15  Q.  And turning to that day, who arrived at the mediation

16  first?

17  A.  Mr. Newberg and his client.

18  Q.  And what, if anything, did you say to him at that time

19  regarding Mr. Liebowitz's attendance at the mediation?

20  A.  I don't recall.  I know pretty soon after that,

21  Mr. Liebowitz's colleague came.  So it's clear that

22  Mr. Liebowitz wasn't going to be there.

23          And I was told by Mr. Newberg that they picked that

24  date because all counsel and clients would be there.  And they

25  specifically chose the 31st based on those representations.

1    Q.  All right.

2            And what, if anything, did you say about Mr. Usherson

3    participating in the mediation, appearing in person?

4    A.  I said nothing about it, nothing at all.  I said, I'm

5    sorry.  I was not a party to the representations between you --

6    meaning Mr. Newberg -- and Mr. Liebowitz as to participation.

7            THE COURT:  Did you say in sum and substance that you

8    doubted that Mr. Usherson would be attending the mediation?

9    A.  I don't recall, again, one way or the other.

10   Q.  Do you recall at that moment if you -- based on your prior

11   experiences with Mr. Liebowitz or your communications, you

12   expected Mr. Usherson to appear in person?

13   A.  Again, your Honor, certain of the mediations, the client

14   was there; and certain of the mediations, the client wasn't

15   there.  I don't want to look backwards at what my assumption

16   was at that time, because I really don't recall.

17   Q.  All right.

18           And how did Mr. Newberg react when he learned that

19   Mr. Liebowitz would not be appearing in person?

20   A.  He was upset.  He said, again, in sum and substance, That's

21   why we picked the 31st; we agreed on that because all parties

22   would be in attendance, and that's the assumption that he acted

23   upon.

24   Q.  And did you say anything to him about when you first

25   learned that Mr. Liebowitz would not be attending in person?

1   A.  I don't recall.  It would have been obviously at the

2   mediation.  I think I said something to the effect, you know, I

3   think Richard is out of town, so I'm not sure he's going to be

4   here.  And again, Mr. Newberg reiterated that that was the

5   whole purpose of choosing the 31st.

6   Q.  And did you say anything to Mr. Newberg one way or another

7   about when you learned that Mr. Usherson would not be appearing

8   in person?

9   A.  I didn't learn that until the mediation was on already.

10  Q.  And I don't want to get into the substance of those

11  negotiations, but there did come a time during the mediation

12  when Mr. Usherson was called on the telephone; correct?

13  A.  Yes.  Without getting into the substance of it, there were

14  proposals on the table.  And at the end of the mediation -- we

15  sat around a table.  And Mr. Usherson was on -- was on the

16  telephone rejecting any such proposals.  That was the only

17  time.

18  Q.  Did Mr. Freeman call him from inside the room?  In other

19  words, were you present when he called Mr. Usherson?

20  A.  I don't know whether that was the first call I had with

21  Mr. Usherson or the second call, but, yes, we were in the room

22  when he had the call.

23  Q.  Okay.  When you say the first or the second, did

24  Mr. Freeman indicate he was calling Mr. Usherson before that

25  call?

K18VUSHH                       Mediator - cross

1  A.  No, it's just at the -- at the time, Mr. Freeman -- I asked

2  to speak to Mr. Newberg alone, him and his client alone, to

3  ascertain where we were.  So Mr. Freeman was in another room,

4  so I don't know what happened then.

5  Q.  And when you were present and Mr. Freeman called

6  Mr. Usherson, did he say anything about his awareness of the

7  mediation in that call?

8  A.  Mr. Usherson?

9  Q.  Yes.  Did he give any indication about whether he had been

10  aware of the mediation?

11  A.  He was aware of the mediation, I'm sure of that, from the

12  indications of the call.  He had certain expectations on what

13  would happen and didn't.

14  Q.  All right.  Very good.

15          I think that, at least for the moment, is all I wanted

16  to ask.

17          Mr. Newberg, let me turn things over to you.

18  CROSS-EXAMINATION

19  BY MR. NEWBERG:

20  Q.  Thank you.  I'd use your name, but you understand.

21          So on December 12, 2019, at the Court's request, you

22  submitted a declaration in this case; correct?

23          THE COURT:  Mr. Newberg, you've got to slow down a

24  little bit --

25          MR. NEWBERG:  Oh, sorry.

1          THE COURT:  -- for the court reporter's benefit.

2    A.  Yes.

3    Q.  On December 12th, you submitted a declaration?

4    A.  Yes, I submitted a declaration.  I presume you have the

5    right date.

6    Q.  Actually, I take that back.  It looks like it was filed

7    December 11th, so my apologies.

8    A.  It was on or about that time, I recall.

9    Q.  And as you sit here today, are you aware of anything in

10   that declaration that would need to be corrected or was untrue?

11   A.  No, again, other than the fact that I -- again, after that

12   time, I went back through the email and I saw something about

13   L.A., and that would be the only thing I would modify.

14   Q.  So but in terms of when you declared that in other cases

15   Mr. Liebowitz has had his client appear telephonically, but you

16   did not give such permission in this case, is that a true

17   statement you still stand by?

18   A.  Yes.

19   Q.  And when you put in your declaration that at no time were

20   you informed that the plaintiff would not appear personally, is

21   that still a true statement that you stand by?

22   A.  That's correct.

23   Q.  And when you declared in other cases Mr. Liebowitz has had

24   an associate appear in his stead, but you did not give such

25   permission in this case, is that a true statement you still

1    stand by?

2    A.  Yes.

3    Q.  And when Mr. Freeman showed up to the mediation that day,

4    were you aware he hadn't made an appearance in this case?

5    A.  No.

6    Q.  Did anyone ever talk to you about whether Mr. Freeman or

7    Mr. Liebowitz would be trial counsel in this case?

8    A.  No.

9    Q.  Were you aware when Mr. Freeman showed up to the mediation

10   that he had just found out about the existence of this case the

11   night before?

12   A.  No.

13   Q.  I'll represent I'm not aware of any emails or other written

14   communications with you that Mr. Liebowitz had asking for

15   permission for his client to attend telephonically.  Are you

16   aware of the existence of any such email where he asked you for

17   permission in writing for his client to attend the mediation

18   telephonically?

19   A.  Based on my recollection and looking through my emails

20   prior to this day, no.

21   Q.  Mr. Liebowitz has testified about certain permissions.  Are

22   you aware of any emails he sent you following up or confirming

23   a supposed permission for his client to attend the mediation

24   telephonically?

25   A.  I'm not aware of that, no.

1   Q.  Are you aware of the existence of any email where he asked

2   you for permission for him to not attend the mediation?

3   A.  Again, I don't recall that there was an email.  But, again,

4   just to clarify the record, I know somewhat prior to the

5   mediation date that he was out of town.  So it's possible that

6   I made a presumption that he might not appear.

7   Q.  But you stand by your declaration that you didn't give him

8   permission to not appear?

9   A.  Not expressly, no.

10  Q.  Now, this is an email exchange that I'm going to hand up to

11  you; it's Exhibit 7 to my November 6 declaration.  This is an

12  email exchange between you and me on October 23rd, a week

13  before the mediation.  Do you recognize it?

14  A.  Yes.

15  Q.  And in it you ask me whether we can have a call the next

16  day, the 24th, it says, "to see if we can settle this matter

17  without you having to come to New York."  Do you see that?

18  A.  Yes.

19  Q.  So is it correct to say that as of that date, late in the

20  evening of October 23rd, 2019, you, at least at that point,

21  expected the mediation to be an in-person mediation with

22  counsel and clients; correct?

23  A.  It would have to be.

24  Q.  You say it would have to be.  Why is that?

25  A.  Because the mediation office, they said -- initially, there

K18VUSHH                          Mediator - cross

1    was a suggestion that the mediation would be telephonic rather

2    than in person.  And I was subsequently informed that the

3    office of the mediation wanted the mediation to be an in-person

4    mediation.  And I said fine.  That's when I communicated to you

5    and Mr. Liebowitz, pick a couple of dates that are mutually

6    convenient.

7    Q.  So you were clear, then, based on the mediation office's

8    instruction, that this had to be an in-person mediation with

9    counsel and clients; correct?

10   A.  Correct.

11   Q.  So if Mr. Liebowitz were to ask for these permissions,

12   would you have referred him to the mediation office's

13   instructions that this had to be in person?

14   A.  Mr. Liebowitz knew it had to be in person, because, I mean

15   that was -- that was what the mediation office had said.  And I

16   communicated both to you and Mr. Liebowitz that it would be an

17   in-person mediation.

18   Q.  I'm going to hand you another email string.  This is

19   actually the last exhibit in my December 10th declaration, the

20   second declaration.

21   A.  Thank you.

22   Q.  And this is an email string between me and you on the night

23   of October 30th, 2019, the night before the mediation.  Other

24   than what has been redacted by the Court, do you recognize it?

25   A.  Yes, I do.

K18VUSHH                          Mediator - cross

1   Q.  I want to direct you to my last email chronologically, the

2   6:34 p.m. email at the top.

3   A.  Yes.

4   Q.  Do you see where I say:  If we can't settle that night, "we

5   will see Mr. Liebowitz and Mr. Usherson tomorrow."

6            Do you see that?

7   A.  Yes, I do.

8   Q.  And you understood that would mean seeing them at the

9   mediation; correct?

10  A.  That was my -- that would be my understanding.

11  Q.  And you don't recall at any time responding, No,

12  Mr. Liebowitz actually won't be at the mediation?

13  A.  No, I did not.

14  Q.  Because, at least as of this email on October 30th, 2019,

15  the night before the mediation, you had no reason to believe

16  Mr. Liebowitz and Mr. Usherson wouldn't be attending the

17  mediation in person.

18  A.  As I say, I had no reason to believe that Mr. Usherson

19  wouldn't be there.  Again, going back and refreshing my

20  recollection, it's quite possible that I had some doubts that

21  Mr. Liebowitz would be there.

22  Q.  But even if you had thoughts that Mr. Liebowitz might be

23  out of town, as you've testified here today, you did not give

24  him permission to not attend the mediation?

25  A.  No.

K18VUSHH                          Mediator - cross

1   Q.  No, you did not give permission?

2   A.  No, I did not.

3   Q.  And your Honor has already asked you about my Exhibit 8.

4   I'm just going to give you a copy.

5            THE WITNESS:  Is it all right if I get my glasses?

6            THE COURT:  Sure.  Are they in the bag?

7            THE WITNESS:  Yes.

8            THE COURT:  My deputy will get the bag, and then you

9   can fish them out.

10           The witness just requested his glasses, so we'll

11  accommodate that.

12           THE WITNESS:  Thank you.

13  A.  Sorry.

14  Q.  No problem.

15           So I'll be brief, since the Court has already asked

16  you about this.  But when I say -- when you say at 8:15 p.m.,

17  Hopefully, we can settle this before need to go to in-person

18  mediation, you say "in-person mediation" because you still

19  expect all counsel and clients to be at that in-person

20  mediation?

21  A.  There's going to be an in-person mediation, there's no

22  doubt about that.

23  Q.  And that email you sent to me at 8:15 was after, as you

24  testified, your last conversation with Mr. Liebowitz of that

25  night?

K18VUSHH                          Mediator - cross

1   A.   That's correct.

2   Q.   And then we have a further communication where I mention

3   that I'm assuming Mr. Usherson is already on his way to New

4   York or would be on a very early plane.

5        And you say, I understand.  Correct?

6   A.   That's correct.

7   Q.   And there's nothing between -- there are no conversations

8   you had with Mr. Liebowitz between 8:15 and 10:03 which would

9   have made you believe Mr. Usherson wasn't attending the

10  mediation; correct?

11  A.   I had no reason to believe one way or the other.  It was an

12  in-person mediation.

13  Q.   You have no reason to believe one way or the other because

14  the question of could Mr. -- could Mr. Usherson attend by

15  telephone just didn't come up; correct?

16  A.   It didn't come up, yeah.

17  Q.   And you stated, when the Court was asking you questions,

18  that Mr. Liebowitz has -- has done this before, where you

19  expected the client to appear, and his client didn't show up;

20  correct?

21  A.   That's true.

22  Q.   And in those cases, you couldn't have given advanced

23  permission because you didn't know in advance whether they'd be

24  showing up, right?

25  A.   That's correct.

K18VUSHH                        Mediator - cross

1          On those occasions, I should add, when it was clear

2     that the client would not appear, we talked to defendant's

3     counsel and advised them of that fact at the mediation, what

4     their -- what their response was, should we go ahead with the

5     mediation or is this another problem.

6     Q.   Right.

7          But in terms of if Mr. Liebowitz was to testify there

8     was a practice of you granting advanced permission, the

9     practice would actually be permitting the mediation to go

10    forward when his client didn't show up?

11    A.   That, in substance, is correct.  I mean, as long as

12    Mr. Liebowitz or his associate had full authority *vis-à-vis* the

13    mediation, and his client could be reached by phone, we would

14    go ahead unless there was an objection.

15    Q.   And finally, the Court asked you about Mr. Usherson's

16    awareness of the mediation, and you said when he was on the

17    phone, he seemed aware of it.

18         Do you know whether he was aware prior to the

19    mediation, as opposed to having just been told on the telephone

20    conversation a few minutes earlier, that we're having a

21    mediation?

22    A.   The only time I heard Mr. Usherson was when you were there

23    on the telephone, so I had no -- no idea where he was or what

24    his level of knowledge was.

25    Q.   So you have no reason to believe one way or the other that

K18VUSHH                        Mediator - cross

1    he was told before October 31st that there would be a mediation

2    that day?

3    A.   That's correct.

4            MR. NEWBERG:  That's all I have, your Honor.

5            THE COURT:  All right.

6            And just to clarify, prior to this case, there had

7    been mediations where the client did not participate in person,

8    and you had blessed that, at least, by proceeding with the

9    mediation in the absence of any objection; is that correct?

10           THE WITNESS:  That's correct.

11           THE COURT:  And prior to this mediation, had

12   Mr. Liebowitz ever sought your permission in advance for the

13   client not to appear in person and to participate by telephone?

14           THE WITNESS:  Again, I can remember one occasion when

15   he informed me that the client was -- was overseas.  And again,

16   I talked to the defendant in the case.  And they were a little

17   upset, but we went ahead and it turned out fine.

18           THE COURT:  All right.  Give me one moment.  I'm going

19   to print a hard copy of one additional email.  Oh, we have it.

20           Now, this is docket number 36, Exhibit 2.  If you

21   could look at that.  That's an email from you to Mr. Newberg on

22   the morning of October 30th at 9:07 a.m.; correct?

23           THE WITNESS:  That's correct.

24           THE COURT:  And it says I -- well, it doesn't say "I,"

25   but, Had a long, frank talk with Mr. Liebowitz last night.  And

K18VUSHH                           Mediator - cross

1     I believe that he would settle for -- and then the figure is

2     redacted, and so forth.  Is that correct?

3                THE WITNESS:  That's correct.

4                THE COURT:  So based on this email, is it correct that

5     you had a conversation with Mr. Liebowitz on the night of

6     October 29th?

7                THE WITNESS:  That's correct.

8                THE COURT:  All right.

9                If you could just move closer to the microphone to

10    make sure everyone can hear you, that would be great.

11               And do you remember if, in that conversation, he

12    indicated where he was at the time?

13               THE WITNESS:  Again, I don't believe so.

14               THE COURT:  Okay.  And at that time did he ask for

15    your permission to allow Mr. Freeman to appear on his behalf,

16    instead of appearing personally?

17               THE WITNESS:  I don't recall that.

18               THE COURT:  And at that time, I take it you still

19    believed that Mr. Usherson would be appearing in person, and

20    there was no conversation or discussion of his participation by

21    telephone; is that correct?

22               THE WITNESS:  There was -- there was no discussion of

23    that.  I mean I expected this to settle at some point.  There

24    was no -- there was no discussion of Mr. Usherson or who would

25    appear or who would not appear.

1              THE COURT:  And just to be completely clear, is it

2     correct that until the mediation itself on October 31st, you

3     had not had any conversation with Mr. Liebowitz regarding

4     Mr. Usherson's physical presence at the mediation?

5              THE WITNESS:  That's correct.

6              THE COURT:  And until the -- all right.

7              Very good.

8              MR. NEWBERG:  I have one more question, your Honor.

9     BY MR. NEWBERG:

10    Q.  Sir, are you -- you mentioned that there was one case where

11    you believe Mr. Liebowitz got advanced permission for the

12    client to attend telephonically.  And I just want to be clear,

13    a case called *Sadowski* has come up today, and I just want to be

14    clear whether you're sure that it was Mr. Liebowitz's client,

15    as opposed to the defendant who was in Israel in the *Sadowski*

16    case, who had asked for advanced permission?

17    A.  That's correct.  I remember the *Sadowski* case quite well.

18    Q.  So in that case, it was actually the defendant who asked

19    for advanced permission?

20    A.  It was, yes, because, again, the client -- one of the

21    parties was in Israel.  And that was -- that was the plaintiff.

22    The plaintiff was in Israel, I believe.

23    Q.  All right.  But your belief is that the one case was that

24    *Sadowski* case, where a party was in Israel?

25    A.  It's just -- I mean I just want to be clear.  In *Sadowski*,

1    the plaintiff was by telephone, because the client was in

2    Israel.

3           I think the other case was the *Onion* case, where the

4    client was overseas.  I believe that's the case -- at least in

5    my mind now, that's what I was referring to.

6    Q.  Okay.  Thank you very much.

7           THE COURT:  All right.  Mr. Freeman.

8           MR. FREEMAN:  If I may approach the witness.  I'd like

9    to hand the docket sheets from those five previous cases, as

10   well as the initial complaint.

11          THE COURT:  Sure.

12          MR. FREEMAN:  Thank you.

13   CROSS-EXAMINATION

14   BY MR. FREEMAN:

15   Q.  Good afternoon, Mediator.

16   A.  Good afternoon.

17          MR. FREEMAN:  So I want to short-circuit this, your

18   Honor, because I know we've covered much of this ground.

19   Q.  So what I've handed you, Mr. Mediator, is five docket

20   sheets and, in addition, the complaint -- initial complaint in

21   the action.  Can you just quickly review and verify that those

22   are the five actions that you served as the mediator?

23   A.  Yes.

24   Q.  Now, with respect to the ones labeled A, B, and C, that

25   would be *Emerson*, *Mottram*, and *McGovern*, I'm just going to,

1    sort of, ask you the same set of questions for each to keep

2    this brief.

3            So in each of these cases, is your recollection that

4    the plaintiff was out of state, was located out of state?

5    A.   I certainly know in *Mottram* --

6    Q.   Right.  That's the one that was in United Kingdom?

7    A.   Yeah.

8    Q.   If it refreshes your recollection, the complaint on

9    paragraph 5 -- it's the same in every complaint, paragraph 5.

10           With *Emerson*, I'll represent to you that it says New

11   Orleans, Louisiana.  Do you want to just confirm that?

12   A.   Yes, I see that.

13   Q.   And then in *McGovern*, which is marked as C --

14   A.   Yes.

15   Q.   -- is Davie, Florida?

16   A.   Yes, I see that.

17   Q.   Now, in each of these cases, *Emerson*, *Mottram*, and

18   *McGovern*, was the mediation successful?

19   A.   Yes.

20   Q.   And is it the case that in each one of those cases, the

21   plaintiff participated via telephone?

22   A.   That's my recollection.

23   Q.   And in each of those cases, did you grant Mr. Liebowitz

24   advanced permission for his clients to appear telephonically?

25   A.   Again, the only one I recall advance was *Mottram*, because

1    I -- I was informed that the client was in London, England --

2    or in England at least.  I don't recall the other two that

3    there was advance.

4    Q.  But the mediations proceeded and they were successful?

5    A.  That's correct.

6    Q.  In the case of *McGovern*, is it your recollection that

7    defense counsel also appeared telephonically?

8    A.  That's *Emerson v.* --

9    Q.  This is, I'm sorry*, McGovern v. Q Digital*.

10   A.  I'm not sure of that.

11   Q.  Fair enough.

12         All right.  So let me turn your attention to the case

13   of *Pereira v. Source Digital*; it's marked as D.  If you could

14   turn to the complaint in that action, paragraph 5.

15   A.  Yes.

16   Q.  It states that Mr. Pereira is located in Brooklyn, New

17   York; is that correct?

18   A.  Yes.

19   Q.  And in that case, did you grant Mr. Liebowitz advanced

20   permission for Mr. Pereira to appear telephonically?

21   A.  I don't think it was advanced permission, no.  But I recall

22   that the defendant appeared in this case telephonically.

23   Q.  With respect to *Sadowski v. Seeking Alpha*, this was the

24   case where I appeared in Mr. Liebowitz's stead.  Do you recall

25   that?

K18VUSHH                      Mediator - cross

1    A.   Yes.

2    Q.   And if you could turn to paragraph 5 of the complaint in

3    that action, *Sadowski*.

4    A.   Yes.

5    Q.   It says that Mr. Sadowski is located in Hawthorne, New

6    Jersey.  Do you know whether that's within 100 miles of the

7    courthouse, Hawthorne?

8    A.   I have no idea, but I presume it is.

9    Q.   And did you -- did Mr. Liebowitz obtain advanced permission

10   from you for Mr. Sadowski to appear telephonically?

11   A.   No.  I recall this quite well.  Because at least general

12   counsel for the defendant in this action was -- this is the

13   Israel action.  They were in Israel.  He was very upset.  We

14   proceeded.  And his counsel was present.  We proceeded.  But he

15   was upset.

16   Q.   In any of the five actions that we've just referred to, do

17   you believe that the participation of the plaintiff

18   telephonically impaired in any way, shape, or form the

19   mediation?

20              THE COURT:  Sustained.  Next question.

21              MR. FREEMAN:  All right.

22              I have no further questions, your Honor.

23              THE COURT:  All right.  Anything else, Mr. Newberg?

24              MR. NEWBERG:  No, your Honor.

25              THE COURT:  All right.  Mr. Mediator, a lack of using

K18VUSHH

1     your name, you may step down.  I thank you very much for your

2     presence here today.  And again, I apologize for how much time

3     it has taken out of your schedule.

4                 THE WITNESS:  Could I leave?

5                 THE COURT:  You may leave.  You are excused.

6                 THE WITNESS:  Okay.  Thank you.

7                 (Witness excused)

8                 THE COURT:  All right.

9                 So I think in my order I had indicated that you should

10    be prepared to have brief argument after the hearing.

11                It's not the most complicated record.  And candidly,

12    I'm not sure there's much to be gained from oral argument.  So

13    I'm happy to dispense with it, but also happy to give you a few

14    minutes if you want to just emphasize a couple points, but I

15    think I can probably infer what you would emphasize if you were

16    given that opportunity.

17                So since I did tell you you would have some time, I'm

18    happy to give you an opportunity, if you wish to say anything.

19    But, again, I'm not sure it's necessary.

20                So, Mr. Freeman, let me start with you.

21                MR. FREEMAN:  Yes.  We'd like about three to four

22    minutes, your Honor, of summation.

23                THE COURT:  All right.

24                Mr. Newberg?

25                MR. NEWBERG:  Yes, your Honor, I'd like just a few

1    minutes.

2              THE COURT:  All right.

3              Since it's your motion, why don't we start with you,

4    that's Mr. Newberg.  And then I'll hear from Mr. Freeman.

5              Let's plan to keep it to five minutes or less.

6              Actually, in our new system, we have a fancy new

7    timer.  So we're going to test that out and see how it goes.  I

8    don't know what happens at the end of the time.  You may fall

9    through the floor where the floor may open up, but we'll find

10   out.

11             MR. NEWBERG:  No worries.  I had eight; I'm going to

12   cut it to five on the fly, and we'll see if I can beat the

13   clock.

14             THE COURT:  Okay.  But not too quickly for the court

15   reporter's benefit.

16             Go ahead.

17             MR. NEWBERG:  That may be eight by minutes, sorry.

18             Your Honor, first off, I want to say in representing

19   someone *pro bono*, I can't really refuse a withdrawal with

20   prejudice; so I'm glad the Court has decided to hold this

21   hearing.  We took this on because, as a copyright lawyer for

22   over 20 years, I wanted to see for myself what it was like to

23   be in one of these cases.  It only took a few days to go south.

24             Mr. Liebowitz originally asked the mediation office

25   and this Court for permission to have a telephonic mediation.

K18VUSHH                    Summation - Mr. Newberg

1    The mediation office denied that request; this Court denied

2    that request.  The Court was clear.  The mediator even told us

3    that he knew it was clear.  There was no wiggle room or room

4    for interpretation.

5           You have undisputed evidence that he chose the October

6    31st date.  It appears he chose this even knowing he had a

7    networking event in Los Angeles.  He chose it never stating he

8    or his client might not attend.  You don't have a single email

9    in evidence showing that Mr. Liebowitz ever informed his client

10   even about the mediation.  And I think it's astonishing that

11   Mr. Usherson didn't put in a declaration here.  It seems quite

12   possible to me he doesn't still know what's going on.

13          You don't have a single email showing Mr. Liebowitz

14   ever informing opposing counsel or the mediator he would not be

15   at the mediation or he would be sending an associate not

16   admitted to this case in his stead, and his client would not be

17   attending the mediation in person.

18          But you have emails very clearly indicating my

19   expectation and the mediator's expectation, even on the night

20   of October 30th, that he was going to be there, both -- and I

21   say "he," both Mr. Liebowitz and Mr. Usherson.  You have an

22   email from Mr. Liebowitz the morning of the mediation not

23   referencing that he or his client wouldn't be there.

24          You have Mr. Liebowitz before this Court at the last

25   conference, soon after the mediation, and in all his papers in

1    response to this motion, unable to tell the Court when he

2    supposedly received permission for him not to attend at all and

3    for his client to not appear in person.  He was asked by your

4    Honor in open court.  He said he didn't know, and this was

5    right after the mediation.  It's simply implausible.

6            He also chose not to put it into his declaration

7    papers.  He's only chosen now to mention the October 30th date.

8    There's no evidence to contradict the mediator's statements in

9    the mediator's declaration.  In fact, his statement is in line

10   with what the mediator told me at the mediation and in a phone

11   call after the mediation, both of which are in my declaration.

12           The only potential conflict Mr. Liebowitz raises is

13   that while the mediator declares that Mr. Liebowitz never

14   raised that he wouldn't be attending at all, I do recall the

15   mediator telling me at the mediation that he was told at the

16   last minute that Mr. Liebowitz would not be attending.  Again,

17   not permission.  And it's quite possible when he said, I think

18   he might be out of town, that that's what I was inferring to be

19   he won't be here.

20           Now, however, as I stated, the mediator never told me

21   or suggested to me that he gave permission for Mr. Liebowitz

22   not to attend.  And his declaration -- as is in his

23   declaration, he made very clear to me that Mr. Liebowitz never

24   raised the subject that his client not attending at any point.

25   And the first time he found out Mr. Usherson would not be

1   attending in person was when I did.  That's when Mr. Usherson

2   didn't show up.

3        And the practice that Mr. Freeman mentioned was

4   clearly disputed by the mediator.  He said, No, I didn't have a

5   practice of giving him advanced permission.  There's a practice

6   that he didn't show up, and we tried to go forward with the

7   mediation.

8        So you have the instructions from the mediation

9   office, you have the orders of this Court, you have the emails

10  and communications between counsel, and you have other emails,

11  including with the mediator.  Nothing in the evidence suggests

12  in the slightest that Mr. Liebowitz ever asked for permission

13  to not attend the mediation at all or for his client to not

14  attend in person.  There's no reason for the mediator to lie,

15  and his testimony that he never gave permissions is unwavering.

16       You have my testimony, declaration from my client, and

17  even the declaration and behavior of Mr. Liebowitz's associate,

18  Mr. Freeman, again, not at appearance in this case, but points

19  to the lack of permission.  He never stated at the mediation

20  that he was given permission or that he knew about permission.

21  He never put it into his declaration.

22       Every piece of information points to the conclusion

23  that Mr. Liebowitz simply failed to follow the rules and was

24  hoping this case would settle and go away before having to have

25  a hearing on this.  So we respectfully recommend the strongest

K18VUSHH                    Summation - Mr. Newberg

1    sanctions this Court has the power to issue, as prior warnings

2    and sanctions of this Court have clearly not had their intended

3    effect.

4            Finally, I do want to bring one last fact to this

5    Court's attention.  This case was filed -- and it goes to the

6    sanctions.  This case was filed on the premise that the

7    photograph in question was subject to a registration filed with

8    the copyright office, number 1-080-046, which contains over

9    2,000 photographs.

10           Not trusting Mr. Liebowitz's representations, before

11   this case settled, we asked the copyright office to deposit

12   copies associated with that registration.  Your Honor might be

13   aware it takes the copyright office a really long time, so we

14   got them at the end of last week.

15           Unless it's seriously mislabeled, we've been unable to

16   locate the photograph at issue in this case anywhere in the

17   deposit copies; so it appears this entire case might have been

18   a sham.  Therefore, to the extent that Mr. Liebowitz is allowed

19   to continue practicing in this Court, we believe it would be

20   proper to require him in any case in this Court to not only

21   serve licensing information at the beginning of the case, but

22   to also serve certified deposit copies from the U.S. Copyright

23   Office related to any registration alleged in his complaints.

24           Thank you.

25           THE COURT:  Let me just follow up with a couple

1    questions, first about that.

2              Where are there representations made in filings in the

3    Court about the licensing of the copyright?

4              MR. NEWBERG:  It's not the licensing, your Honor.  The

5    complaint --

6              THE COURT:  Registration, excuse me.

7              MR. NEWBERG:  Yes.  The complaint says that it's

8    subject to this registration:  DAU 1-080-046, that's in the

9    complaint.  And that's the sole basis for the complaint.

10             THE COURT:  And that is --

11             MR. NEWBERG:  This is a copy of the deposit.  I have

12   the certified one, which is not-to-be-opened sort of thing, in

13   my office.  I'm happy to give this copy to the Court.

14             THE COURT:  All right.  I would like that.  If you

15   could hand that up, that would be great.

16             And second, in terms of sanctions that you would

17   propose, in the event that I found that sanctions were

18   warranted, what is your proposal?

19             MR. NEWBERG:  Well, your Honor, as you know, we are

20   not in this case; I'm here more, frankly, as an officer of the

21   Court than anything.

22             So if the Court is to award monetary sanctions, I

23   completely leave that to the Court.  And if the Court wants it

24   to be reflective of the time and costs that we've spent on this

25   case or at this motion, I'm happy to give documentation on

K18VUSHH                      Summation - Mr. Newberg

1    that.  I'm happy -- obviously we are not in this case anymore.

2    I think any sanctions should go to a court or a *pro bono* fund.

3    We operate one, but any one that the Court would choose.

4         I think that given the prior issues in this Court,

5    that the Court is well aware of, and how close Mr. Liebowitz

6    came to an issue in the *Berger* case, in terms of him being

7    referred to the grievance committee, I certainly think this

8    issue should be referred as well.  And the Court can take

9    whatever is in its inherent powers.  This has gone on for too

10   long.

11        And then, of course, I mentioned the sanctions that I

12   do believe that to the extent he is allowed to participate in

13   cases in this Court, that certified copies of the deposit

14   copies that are associated with registrations should be

15   provided, along with the licensing information that your Honor

16   typically orders at the beginning of these cases.

17        THE COURT:  With respect to the sanctions, first of

18   all, I would ask that by -- I'll give you a week, why don't you

19   file an accounting of the fees and costs that are associated

20   with both the mediation and litigation of your sanctions

21   motion.  I recognize that you've handled this *pro bono*, but,

22   nevertheless, I think you can presumably tally those up.  I

23   intimate no view on whether I'm going to grant that, but I

24   think it would be helpful to have that as part of the record.

25        If I did decide that some sort of monetary sanction

1   was appropriate, did I understand you correctly that you're not

2   asking that your firm be paid that sanction, that you think it

3   would be more appropriate to either go to the Court or to some

4   sort of charitable or, you know, other kind of --

5          MR. NEWBERG:  Yes, your Honor.  I can tell you that if

6   it went to our firm, what would happen in this case is the

7   costs, which we have decided to eat, instead of passing them on

8   to defendant, any costs typically in this case that we would

9   get, we would be reimbursed for the costs, and all of the

10  attorneys' fees would go to our *pro bono* fund.

11         In this case, I don't even think we would do that; I

12  think costs and fees, if they came to us, would simply go into

13  our *pro bono* fund, and not to the Luke Horowitz Equity

14  Partners, so to speak.

15         But, yes, some sort of legal aid *pro bono* fund, the

16  Court.  I am not requesting that McGuire Woods profit from

17  this, nor do I believe my client, who we represent *pro bono*,

18  should be profiting from this issue.

19         THE COURT:  All right.  Thank you.

20         Mr. Freeman?

21         MR. FREEMAN:  Thank you, your Honor.

22         So let me start by saying that the -- what the

23  Liebowitz Law Firm does is we're in the business of law

24  enforcement.  And specifically, we're in the business of

25  enforcing intellectual property rights of --

1          THE COURT:  Mr. Freeman --

2          MR. FREEMAN:  This is important to us, your Honor, if

3     I might just have --

4          THE COURT:  But it's not important to me.  I want you

5     to focus on the subject matter of the hearing.

6          MR. FREEMAN:  Okay.  So I'll segue that into let's

7     talk about exactly what this motion for sanctions, the

8     evidentiary standards that are required.

9          The defendant has made a motion for sanctions pursuant

10    to the Court's inherent authority to sanction; and has also

11    made a motion pursuant to Federal Rules of Civil Procedure,

12    specifically, Rule 16.  The evidentiary standards for those two

13    are quite different.

14         The inherent power is not to be invoked pursuant to

15    Supreme Court authority unless there's clear and convincing

16    evidence of bad faith.  In the case of *Rice v. NBC Universal*

17    that your Honor decided this past summer, that was a case where

18    it was essentially just a no-show.  Mr. Liebowitz didn't show

19    up to mediation, Mr. Liebowitz didn't show up to the Court's

20    hearing, and the Court determined that that was bad faith.

21         This is not this case.  This is a case where, you

22    know, it's plain that good-faith efforts were made to

23    participate in mediation.  Well, they could say there wasn't,

24    but look at how much paper and look at how much testimony has

25    been evinced in this proceeding to determine whether or not

K18VUSHH                         Summation - Mr. Freeman

1   there was bad faith or was it just neglect or was it just the

2   case, as we allege, that Mr. Liebowitz was simply following an

3   established custom and practice with the mediator who he had

4   five previous experiences with three to four months prior to

5   this particular mediation.  It certainly does explain --

6           THE COURT:  Let me interrupt and ask you two

7   questions.

8           First of all, am I correct in assuming if I were to

9   find that Mr. Liebowitz's representations to me, both in court

10  and under oath and in his testimony, if I were to find that

11  they were false, that that would be a basis for sanctions

12  pursuant to my inherent authority?  I assume you don't dispute

13  that proposition?

14          MR. FREEMAN:  Let me think about that.  I mean,

15  there's -- if the Court were to find that Mr. Liebowitz has

16  committed -- has testified --

17          THE COURT:  Lied.  Let's put it bluntly.  If I find

18  that he has lied, that would be a grounds for sanctions

19  pursuant to my inherent authority; correct?

20          MR. FREEMAN:  Yes, that would be.

21          THE COURT:  Okay.

22          Second, you filed -- you or Mr. Liebowitz, because

23  he's counsel of record, filed an opposition to the motion for

24  sanctions in this case; correct?

25          MR. FREEMAN:  Yes, the firm did file a motion for

1    opposition -- opposition brief to sanctions.

2              THE COURT:  And give me a moment to call that up.

3    That was filed on November 18th; is that correct?

4              MR. FREEMAN:  Yes.

5              THE COURT:  And anywhere in that submission did you or

6    Mr. Liebowitz make any reference to the custom and practice

7    with this mediator of allowing the client to participate by

8    telephone or allowing an associate to appear on Mr. Liebowitz's

9    behalf?

10             MR. FREEMAN:  No, I don't believe so.  It was raised

11   in the letter to the Court.

12             THE COURT:  The first time that that argument was made

13   was in the December letter in response to the mediator's

14   declaration; correct?

15             MR. FREEMAN:  That's correct.

16             THE COURT:  Okay.  Go ahead.

17             MR. FREEMAN:  So the issue is that if the Court does

18   not find -- if the Court finds here -- I think the evidence

19   here shows that there was clearly a miscommunication between

20   the mediator and between Mr. Liebowitz.

21             The mediator did report to duty on the morning of

22   October 31st, and did inform opposing counsel that

23   Mr. Liebowitz would not be there, according to the sworn

24   declaration of Mr. Newberg.  He also expressed doubt that

25   Mr. Usherson would be there.

1        It sort of strains credulity to think that, well, no

2   discussion was even had, and that this was just purely

3   speculative meanderings of the mediator.

4        Clearly, there was a communication the night before

5   and the issues were discussed.  In that scenario, it does

6   create what can only be described as a gray area.  And to the

7   extent that they are arguing, Well, Mr. Liebowitz should be

8   submitted to the grievance committee, the grievance committee

9   is typically reserved for situations where there's venal intent

10  or bad-faith intent or an intent to perjure oneself.

11       There's no evidence here that Mr. Liebowitz has said

12  anything on the record that wasn't consistent with his

13  understanding of the discussions with respect to him getting

14  permission from the mediator.  And the fact that we have five

15  cases in which the exact same protocol was followed, I mean, as

16  Mr. Liebowitz stated on the stand, there's no question that he

17  did not follow best practices here; he should have gotten it in

18  writing.  He procrastinated, there's no question, and he does

19  apologize to the Court.  And we apologize to the Court for

20  that, for not following best practices.  But not following best

21  practices and having sanctions imposed against an officer of

22  the Court is two completely different standards.

23       So in this case, Mr. Liebowitz has testified

24  repeatedly, first before the hearing in the court in November,

25  again in his declaration, and again here today, that he had the

discussion with the mediator; that he did get the permission; and that was consistent with the custom and practice.  And although the mediator seems to dispute that, the mediator, on several occasions, said he didn't recall precisely what happened.  So we would just simply call the mediator's memory into question.

In terms of the court order -- because we have anticipated that, you know, there could be a finding here that even if Mr. Liebowitz did obtain permission from the mediator, that the Court may find, Well, it makes no difference, because the Court had ordered that an in-person mediation take place.  And I state this with the most respect and with tremendous humility, but the Court's order, as specific as it was, it did not specifically state attorney and client must appear in person.  And I believe we did cite in our letter, you know, the camp mediation in the Second Circuit has a rule which specifically states attorney and client.

So we're not saying that the Court's order lacks specificity, but we're saying that it was open for interpretation; and that in cases where a court order is open for interpretation, you know, the attorney should not be sanctioned for adopting an interpretation which, in the Court's view, it might not have been the best interpretation, but it certainly was open for interpretation as to whether or not the client was absolutely required to attend.

1          I think we can all agree here that had the court order

2     said attorney and client must appear, it would be clear; we

3     wouldn't even have to have a discussion.  But in this case,

4     Mr. Liebowitz did testify under oath that his understanding was

5     that meant that, at the very least, the lawyer would need to

6     attend in person.

7          With respect to the issue of trial attorney, I could

8     state we've been -- we've only had two trials over 2,000 cases

9     filed.  And in both those trials, I did serve as trial counsel.

10    That's not -- so there is sort of an assumption in our

11    operation that if the case does eventually get to trial, I am

12    going to handle it.  I am 19 years at bar; Mr. Liebowitz is

13    only four years at bar.  So it's just a question of experience

14    in that regard.

15         THE COURT:  You handled those two cases solo or

16    with --

17         MR. FREEMAN:  Yeah, with the case of *Mango v. Buzz

18    Feed*, I was lead counsel; I handled it solo.  Mr. Liebowitz was

19    no even counsel of record in that case.  And the other case

20    before Judge Woods, I handled.  This was *Otto v. Hearst

21    Communications*.  I did handle the work as lead counsel, but

22    Mr. Liebowitz did do a couple of cross-examinations to get his

23    feet wet.

24         THE COURT:  And you're aware that my initial

25    conference order states unambiguously that absent leave of

1    Court obtained by letter motion filed before the initial

2    conference, that all conferences must be attended by the

3    attorney who will serve as principal trial counsel; correct?

4              MR. FREEMAN:  I am aware of that, your Honor, yes.

5              THE COURT:  So it seems to me that either

6    Mr. Liebowitz and you have violated that order, because

7    Mr. Liebowitz is the only counsel who has entered a notice of

8    appearance and appeared on behalf of Mr. Usherson, until today,

9    or you violated the mediation rules which require very clearly

10   that the lawyer who is primarily responsible for trial has to

11   appear at the mediation.  So it's one or the other, am I

12   correct about that?

13             MR. FREEMAN:  Well, no, this is what -- what I'm

14   saying is that the -- we're not precluding the possibility that

15   Mr. Liebowitz could have served as trial counsel as of the time

16   of the initial case management conference.  It's not fully

17   foreclosed that I'm going to handle automatically every trial.

18             But it could have been Mr. Liebowitz's interpretation

19   the night before mediation, which is several months later, that

20   if the case, you know, passes a certain threshold in terms of

21   the procedure, that I'm going to be called in to do the trial.

22             So we didn't have that discussion, to be clear, but

23   I'm just saying that that's something that, in our custom and

24   practice, I had in the past handled the trial.  So, you know,

25   to the extent that the rules say lead counsel, they don't; they

1   just say, you know, the person who's ultimately going to handle

2   trial.

3          So, again, what we're really saying is, you know, this

4   case presents --

5          THE COURT:  My order also says all counsel are

6   required to register promptly as filing users on ECF.  And you

7   didn't file -- in fact, to this date have not filed --

8          MR. FREEMAN:  I have not because I made clear to the

9   Court at the conference at the outset in November that my

10  participation in this case was going to be to defend the

11  Liebowitz Law Firm and Mr. Liebowitz from the motion for

12  sanctions.  That's been my role in this case.

13         The case is now settled, so I think the question is

14  moot as to whether I will eventually serve as trial counsel.

15  That's the way -- and just to be clear --

16         THE COURT:  Let me ask you, you're not under oath, but

17  you are an officer of the Court, did you know of the existence

18  of this case prior to October 30th, 2019?

19         MR. FREEMAN:  I did not, your Honor.

20         THE COURT:  So the first time you learned about it was

21  the evening before the mediation?

22         MR. FREEMAN:  That's correct, your Honor.

23         THE COURT:  Okay.

24         And then the last question I have for you is can you

25  comment on the registration issue that Mr. Newberg raised?

1          MR. FREEMAN:  I haven't seen the registration issue.

2     I think what he's saying is that -- I'm not sure if he's

3     speculating or whether or not he's actually obtained a

4     certified deposit copy from the copyright office.  But what

5     he's saying is that the photograph is not on deposit with the

6     particular registration, is that -- are you saying that you

7     think or are you saying that you know?

8          MR. NEWBERG:  I'm saying that I know.

9          THE COURT:  I think he's saying he reviewed those that

10    are on file, registered with the copyright office, and this

11    photograph does not appear to be among them.

12         MR. NEWBERG:  That's exactly --

13         MR. FREEMAN:  Well, I mean -- I have not -- we did not

14    order a deposit copy.  And in our custom and practice, we do

15    not order deposit copies because they incur an additional

16    expense.  Typically, what happens is once we get into discovery

17    and once we believe that we're going to proceed with the case

18    to summary judgment, it's at that point that we'll invest, and

19    sometimes it's 600 to $1,000.  At that point we will get the

20    certified deposit copy.

21         We should say, however, that in every case that we

22    file, the client represents to us that it's on deposit, if the

23    client is the one who registered.  More often the case though

24    in the last four years, it's our law firm that files the

25    registration process, and we have employees who handle it.  So

K18VUSHH                    Summation - Mr. Freeman

1   we know for sure it's on deposit.

2           I think in this case, you know, it's obvious, we --

3   our law firm did not file the deposit copy.  Mr. Usherson

4   represented to us that he did.  Did we verify that prior to

5   filing?  No.  But I don't believe that we have an obligation to

6   incur the expense of doing that if the client is representing

7   that it's on deposit.

8           THE COURT:  Okay.

9           Paragraph 9 of the complaint in this case says the

10  photograph was registered with United States Copyright Office

11  and was given copyright registration number, and then the

12  number that Mr. Newberg gave before.

13          MR. FREEMAN:  Yes, that's correct.  And that's a

14  matter of public record.

15          So we're able to verify, before we file the case, we

16  could just jump on the copyright office's website, punch in the

17  number, and the copyright registration certificate pops right

18  up.  And we could see that Mr. Usherson was the copyright

19  claimant in that particular case.

20          THE COURT:  But your testimony is that you could

21  not -- that was based on Mr. Usherson's representation that the

22  photograph in this case was under that copyright registration

23  number?

24          MR. FREEMAN:  That is correct, your Honor.

25          We do not -- as an ordinary course of practice, if a

1   client comes to us, and it's one of these old, you know,

2   rock-and-roll photos that was registered in the '70s or the

3   '80s, obviously our law firm didn't register, the client

4   registered.  The client will say to us, This photograph is on

5   deposit with this registration.  And we take them for their

6   word.  We don't -- we do not verify before filing the case by

7   obtaining a certified deposit copy whether or not it's

8   actually -- and look, I mean, ultimately that -- you know,

9   there's no legal or statutory requirement that we do so.  I

10  mean, it's not -- it's not -- it's the ordinary case that

11  lawyers will rely on what their clients are telling them.  If

12  the client turns out to be lying, I mean, I don't know that

13  that falls on counsel.  I think that falls upon the party.

14          But, I mean, is there any question that -- you know,

15  because you say, Well, the best course of practice would be to

16  make sure with these rock-and-roll photographs that you verify

17  prior to filing.  I don't know that we would debate that.  But,

18  again, there's no statutory or regulatory requirement that we

19  do so.  And ultimately, we are entitled to rely on a client.

20  In this case, the client, this is not the first time that we've

21  represented this client successfully.  So we didn't have any

22  reason to doubt the veracity of his representations.

23          THE COURT:  All right.

24          Mr. Newberg, is this something that you could provide

25  a copy to plaintiff's counsel?

1          MR. NEWBERG:  I believe we -- well, we have the

2     certified copy, we can make a copy of that.  I believe my

3     associates also already made a copy; so, yes, we can.

4          THE COURT:  All right.  Why don't you do that by

5     overnight mail no later than tomorrow, so for receipt by

6     Friday.

7          By next Friday I want a letter brief from you

8     indicating, one, whether the photograph at issue in this case

9     was, in fact, registered with the copyright office; and, two,

10    if it was not, why sanctions would not be appropriate based on

11    the allegation in paragraph 9 of the complaint.

12         And in that regard, you can distinguish between

13    sanctions on counsel, who signed the complaint, or sanctions on

14    the client, who may have provided the erroneous information, if

15    it was erroneous.  But I want you to address those issues by

16    next Friday.  All right?

17         MR. FREEMAN:  I do have one more point to make, your

18    Honor.

19         THE COURT:  Last point, because I have a meeting that

20    I am running in five minutes, so I will give you one more

21    minute, but go ahead.

22         MR. FREEMAN:  Thank you.

23         So in the case of *Rice v. NBC Universal*, you may

24    recall that the --

25         THE COURT:  I recall it well.  Go ahead.

1          MR. FREEMAN:  Yes, that after the parties fully
2    submitted the brief -- I'm sorry, that before the parties
3    submitted the brief, there was a stipulation and order that the
4    party, the defendant, would bear its own costs and fees.  And
5    then we raised that in passing in the opposition brief, but it
6    wasn't until the motion for reconsideration where we forcefully
7    argue that, Well, look, I mean, if you're a defendant and you
8    waive fees, that means you've waived fees with respect to the
9    sanctions motions as well.  And your Honor held on the motion
10   for reconsideration that it was too little, too late, sort of
11   as a procedural waiver, that we couldn't make that argument
12   because we hadn't made it in a fulsome fashion prior.
13          In this case, the stipulation order came after we
14   briefed, so we never made the argument at all.  So we would ask
15   leave of Court to submit just a one-page letter brief to
16   address the issue as to whether or not the Court -- I'm not
17   sure if this is a question over that the Court has jurisdiction
18   or if it's just a question of waiver, if the defendant
19   knowingly signed a stipulation saying, We waive all attorneys'
20   fees, you know, related to this action, can they be awarded any
21   attorneys' fees at all.  We think that's a critical issue.
22          THE COURT:  Let me interrupt you.
23          He's not seeking fees.  He suggested that perhaps
24   costs/fees could be the measure of sanctions, but he's not
25   asking that I reward them fees; he's asking that I direct that

1    they be paid either to the Clerk of Court or something like

2    Legal Aid.  So how would the stipulation, even if you're

3    correct about waiver of the fees, apply in this instance?

4                MR. FREEMAN:  Well, I think that because there needs

5    to be, you know, some causal connection between the amount of

6    sanctions awarded and the conduct that is being alleged.

7                So in the cases where Liebowitz Law Firm has been

8    ordered to pay sanctions to the Clerk of Court, it's never been

9    more than the amount of $2,000; in other cases it's been 500,

10   1500.  In this case, he's likely seeking tens of thousands of

11   dollars.

12               THE COURT:  All right.  I'll tell you what, I'll give

13   you until Monday to submit a letter no longer than three pages

14   addressing this issue and, to the extent that I conclude that

15   sanctions are appropriate, what you believe the appropriate

16   sanction would be, either in terms of size or nature.

17               And Mr. Newberg, if you care to reply to that, you can

18   do so by Wednesday.  And I think I'll give you until next

19   Friday then to submit an accounting of your fees and costs so

20   that it takes account of that submission as well.

21               All right?

22               MR. NEWBERG:  Thank you, your Honor.

23               And fees and costs, I assume you just mean related to

24   the sanctions motion; correct?

25               THE COURT:  Fees and costs related to the mediation

K18VUSHH

1    and the sanctions motion.

2              MR. NEWBERG:  Thank you, your Honor.

3              THE COURT:  And if you could break it down, again, I

4    may or may not conclude that sanctions are appropriate, may or

5    may not conclude that that is the appropriate basis or way to

6    calculate them, but it would certainly be helpful to have my

7    options as I ponder this.

8              I will reserve judgment on the motion.

9              I'm going to leave the exhibits that you gave the

10   witnesses here for my law clerk to give you if you want them

11   back.  I think they are all part of the record already, but, in

12   any event.

13             All right.  We are concluded.  I'll reserve judgment.

14             Have a good day.  Thank you.

15                            *    *    *

16

17

18

19

20

21

22

23

24

25

1                          INDEX OF EXAMINATION

2    Examination of:                              Page

3    RICHARD LIEBOWITZ

4    Direct By Mr. Freeman  . . . . . . . . . . . . 7

5    Cross By Mr. Newberg . . . . . . . . . . . . .11

6    Redirect By Mr. Freeman  . . . . . . . . . . .79

7    BRAD R. NEWBERG

8    Cross By Mr. Freeman . . . . . . . . . . . . .83

9    THE MEDIATOR

10   Direct By The Court  . . . . . . . . . . . . .90

11   Cross By Mr. Newberg . . . . . . . . . . . . 106

12   Cross By Mr. Freeman . . . . . . . . . . . . 118

13                         DEFENDANT EXHIBITS

14   Exhibit No.                              Received

15    1   . . . . . . . . . . . . . . . . . . . .17

16

17

18

19

20

21

22

23

24

25